**2020 IL 123972**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 123972)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
WILLIAM COTY, Appellee.

*Opinion filed June 4, 2020.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Kilbride, Garman, Theis, Neville, and Michael J. Burke concurred in the judgment and opinion.

**OPINION**

¶ 1        In this appeal, the State challenges the appellate court's determination that the circuit court's imposition of a discretionary, 50-year sentence for this intellectually disabled defendant amounts to an unconstitutional *de facto* life sentence, violative of Illinois's proportionate penalties clause (Ill. Const. 1970, art. I, § 11). The appellate court held that the characteristics of the intellectually disabled, identified

in *Atkins v. Virginia*, 536 U.S. 304, 320 (2002), mitigate culpability and should have been, but were not, adequately considered by the circuit court when defendant was resentenced. 2018 IL App (1st) 162383. In a cross-appeal, defendant argues that his sentence also violates the eighth amendment of the United States Constitution or, in any event, that the sentence is excessive. We reject defendant's contentions and reverse the judgment of the appellate court.

¶ 2                                    BACKGROUND

¶ 3         Following a jury trial in the circuit court of Cook County, the defendant, William Coty, who is intellectually disabled, was found guilty of one count of predatory criminal sexual assault of a child, one count of criminal sexual assault, and one count of aggravated criminal sexual abuse for conduct committed against the six-year-old victim, K.W.[1] Because the defendant had a prior conviction for aggravated criminal sexual assault perpetrated on a nine-year-old victim, pursuant to section 12.14.1(b)(2) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12-14.1(b)(2) (West 2004)),[2] the circuit court had no discretion but to sentence defendant to the statutorily prescribed term of mandatory natural life in prison.

¶ 4         After his conviction and sentence were affirmed on appeal, the defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1401 (West 2004)), alleging that his mandatory natural life sentence was unconstitutional under the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The defendant argued that the statutory scheme under which he was sentenced was facially unconstitutional because it categorically forbade the sentencing judge from considering his intellectual disability[3] and the circumstances of his offense. In the alternative, defendant asserted that the statutory scheme, as applied to him, violated the proportionate penalties clause of the Illinois

---

[1]A full account of the trial evidence can be found in the appellate court's original disposition. *People v. Coty*, 2014 IL App (1st) 121799-U.

[2]Section 12-14.1(b)(2) was recodified as section 11-1.40(b)(2) (see Pub. Act 96-1551, art. 2, § 5 (eff. July 1, 2011) (recodifying 720 ILCS 5/11-1.40(b)(2))) and became effective July 1, 2011.

[3]Courts below, at times, used the term "mental retardation." We choose to refer to defendant's condition as an "intellectual disability"; however, we will retain the term "retardation" when used in lower court proceedings and relevant case authority.

Constitution (Ill. Const. 1970, art. I, § 11). The circuit court dismissed the defendant's petition, and the defendant appealed.

¶ 5    In a nonprecedential disposition filed pursuant to Illinois Supreme Court Rule 23(b) (eff. July 1, 2011), the appellate court reversed in part, holding the mandatory sentencing statute unconstitutional as applied.[4] *People v. Coty*, 2014 IL App (1st) 121799-U. The circuit court's order dismissing the defendant's section 2-1401 petition was vacated, and the cause was remanded for resentencing. The appellate court found that the circuit court had improperly dismissed the defendant's petition, *sua sponte*, on the basis of timeliness. On the merits, the appellate court held that, while the circuit court was correct that the defendant had failed to properly state a facial challenge to the mandatory sentencing scheme under which he was sentenced to natural life in prison, it erred in finding that the defendant had also failed to state an as-applied challenge to that sentencing scheme on the basis of the Illinois Constitution's proportionate penalties clause. The appellate court remanded for resentencing, noting, *inter alia*, that defendant's "crime comprised *** a single, brief and limited encounter with the [six-year-old] victim." *Id.* ¶ 77. In other words, the fact that defendant placed his finger in the vagina of a six-year-old for only a minute was, in some sense, mitigating. The appellate court also opined that defendant had "confessed and expressed remorse for his conduct."[5] *Id.*

---

[4]For reasons not apparent to us, the State did not appeal that decision.

[5]We are compelled to point out that the appellate court's conclusion is somewhat misleading, given the version of events defendant provided in his statement to authorities, which the appellate court acknowledged earlier in its disposition:

"The defendant stated that on November 18, 2004, he was changing his clothes in his bedroom with his door open when K.W. walked into the room. The defendant told K.W. to leave but she would not. The defendant stated that he finished changing his clothes behind a curtain and then sat on his couch. He averred that K.W. then sat on his lap and 'began grinding her butt on his lap.' The defendant stated that 'his penis was hard' but claimed that he and K.W. were both clothed. [Defendant changed that part of his story later in his statement.] He stated that he then placed his right hand underneath K.W.'s clothes and touched her vagina. He admitted that [ ]he 'inserted his finger into [K.W.'s] vagina up to the first joint.['] The defendant stated that he did not move his finger inside of K.W.'s vagina and that he kept it inside only for 'one minute.' The defendant averred that K.W. said 'that feels good.'

In his handwritten statement, the defendant further stated that K.W. pulled her shorts and panties down to her knees before sitting on his lap. He then stated that she was not wearing pants when she was seated on his lap. The defendant also stated that after K.W. got off his lap and pulled her pants up, she left the room and he saw her go upstairs with her parents into her grandparents' room. The defendant then left the house out of the front door and went to his

¶ 6     On remand, given the appellate court's holding that section 12-14.1(b) of the Criminal Code, as applied to the defendant, violates the proportionate penalties clause of the Illinois Constitution, the sentencing judge turned to other applicable sentencing statutes. Specifically, as a Class X offender, the defendant was punishable by a sentencing range between 6 and 30 years. 730 ILCS 5/5-8-1(a)(3) (West 2004). In addition, because the victim was under 18 years of age, the defendant was further eligible for an extended-term sentence of up to 60 years' imprisonment (*id.* § 5-5-3.2(c)).

¶ 7     On August 10, 2016, the matter came before the circuit court for resentencing. At the outset, the court acknowledged that the cause was remanded for resentencing because of defendant's intellectual disability. The court stated:

> "I will indicate, first of all, *** that I was tendered a large volume of materials both by the State and Defense that included, among other things, the transcript of the original trial, and the sentencing that occurred, including the testimony of a Doctor who testified regarding William's intellectual difficulties or disabilities. I am taking all that into account."

¶ 8     Defense counsel asked the court to "take the expert opinion into account that was given at the motion to suppress statement, a copy of the transcript also." The court responded, "I have reviewed that also." Thereafter, the court noted that it had received a new presentence investigative report (PSI) and asked if there were any corrections or deletions to that. The State and defense both indicated there were none. The parties responded similarly when asked if they were calling witnesses. The court advised the parties: "Obviously I'm familiar with the case. I'm familiar with his background."

¶ 9     For her part, the prosecutor noted, even though the appellate court characterized the sexual assault as "a single brief act of penetration, it was very disturbing and

---

sister's house. He also stated that he 'felt bad that he touched the little girl' and that he was aware that she was six years old." 2014 IL App (1st) 121799-U, ¶¶ 22-23.
While defendant did indeed admit to the conduct and express remorse, he also tried to minimize his culpability by suggesting that the six-year-old victim *initiated* the sexual encounter and was *gratified* after the fact.

emotionally upsetting both for the victim and especially for the victim's family, her mom in particular." The prosecutor continued:

> "This Defendant, there really—the fact that his IQ is in the 55 to 65 range, under prevailing social norms, his culpability was less than a person with normal cognitive capacity according to the Appellate Court. Nevertheless, the Defendant knew what he was doing in that he told the victim he was very careful in how he approached her and told her not to tell anyone and then left immediately when she went up to call for assistance or to tell somebody what had happened. So clearly he was aware what he had done and what he had done was wrong."

¶ 10 On behalf of defendant, defense counsel emphasized the brevity of the encounter and suggested the encounter was not "preplanned or orchestrated. It seemed simply impulsive ***."[6] She further observed:

> "Given both the nature of the crime and his disabilities, the Appellate Court found that the natural life sentence was so disproportionate as to violate the moral sense of our community, and that is a direct quote. Judge Toomin found and the Appellate Court agreed that my client suffered from, and the specific finding was that my client was mildly mentally retarded."

Counsel noted "[t]here were expert opinions elicited at the motion to suppress statements, and there was a family member who testified at his sentencing" that defendant had been "retarded since he was a baby." Counsel opined "due to some of his intellectual shortcomings, [defendant] is, in fact, less culpable than others might be." She asked the court, "in keeping with the Appellate Court opinion, that you give him a term of years that allows him upon sufficient punishment to resume some sort of life following incarceration."

¶ 11 Prior to pronouncing sentence, the circuit court stated:

---

[6]As noted in the appellate court's original disposition, the victim, K.W., testified at trial that "defendant came into the room and sat down on the couch with her. He then started to 'scooch' toward her and every time she moved away, he moved closer until she could no longer move. K.W. stated that the defendant then touched her arm, her shoulder, her leg, and then 'started messing with me down there.' She identified that part of her body as the 'part that [she] use[s] to go to the bathroom with.' " 2014 IL App (1st) 121799-U, ¶ 13.

- 5 -

"I'm going to consider today the evidence presented at trial, the pre-sentence report, the evidence offered in aggravation, mitigation, the statutory factors in aggravation, mitigation, the financial impact of incarceration, the arguments the attorneys just made here moments [a]go, and the assertions relative to the mother of the victim indicating that she still takes this case seriously, this was a serious case, and this was an offense committed by somebody whom this was not the first. He was previously sentenced to a period of natural life."

With that prologue, the court sentenced defendant, who was then 52 years old, to 50 years in prison. The sentence was to be served at 85%, and defendant was given credit for 3553 days. The term of incarceration was to be followed by a period of three years to life of mandatory supervised release.

¶ 12　　Thereafter, defense counsel filed a motion to reconsider, arguing, *inter alia*, that (1) the sentence was excessive in light of the defendant's background and the nature of the offense, citing the proportionate penalties clause, (2) the circuit court improperly considered in aggravation matters that were implicit in the offense, and (3) the State failed to prove eligibility for an enhanced penalty or extended term. The circuit court denied the motion, and defendant appealed.

¶ 13　　On appeal, defendant contended, first, that the circuit court abused its discretion in sentencing him to a 50-year, extended-term sentence without properly considering that it was, in fact, imposing a *de facto* life sentence on a defendant with intellectual disabilities. Second, the defendant contended that the imposition of the *de facto* life sentence is unconstitutional as applied to him, under both the eighth amendment of the United States Constitution and Illinois's proportionate penalties clause.

¶ 14　　In a precedential disposition (2018 IL App (1st) 162383), the appellate court vacated defendant's sentence and reversed and remanded for a new sentencing hearing.[7] The appellate court found no abuse of discretion because "the trial court explicitly stated it considered the evidence presented at the defendant's trial and the parties' arguments, both of which referenced the defendant's disability at the time of his trial in 2006." *Id.* ¶ 54. Nonetheless, the appellate court concluded that the

---

[7]The court ordered the new sentencing hearing to be conducted by a different judge. No basis appears in the record for that action, and the appellate court offered none.

imposition of a 50-year *de facto* life sentence on this particular defendant, without the procedural safeguards of *Atkins*, 536 U.S. at 320, *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny, was a penalty so wholly disproportionate that it violated the moral sense of our community. 2018 IL App (1st) 162383, ¶ 75. The court identified the factors referenced in *Atkins* as relevant considerations in sentencing an intellectually disabled individual:

"As *Atkins* articulated, those attendant characteristics include, but are not limited to, an intellectually disabled person's diminished capacity (1) to understand and process information, (2) to communicate, (3) to abstract from mistakes and learn from experience, (4) to engage in logical reasoning, (5) to control impulses, and (6) to understand others' actions and reactions, so as to be more susceptible to manipulation and pressure. *Atkins*, [5]36 U.S. at 318." *Id.*

¶ 15 Without further referencing of the mandatory sentencing provision under which defendant was originally sentenced, the appellate court held that defendant's *de facto* life sentence was unconstitutional as applied, as it was violative of the Illinois proportionate penalties clause. *Id.* ¶ 86. The appellate court noted that the record on the first remand was

"void of any information about the state of the attributes of the defendant's intellectual disability in 2016. The new PSI ordered for purposes of resentencing contained no reference whatsoever to the defendant's intellectual disability. *** As such, the resentencing court was without an iota of evidence from which to determine whether the defendant's cognitive ability, behavior, adaptability, or ability to comprehend the consequences of his actions had changed for better or worse in the 10 years of his imprisonment. Therefore, the trial court was without the necessary facts from which to determine whether the defendant could be restored to useful citizenship or whether he was so irretrievably depraved and of such danger of recidivism that a natural life sentence was warranted." *Id.*

¶ 16 The appellate court—acknowledging that defendant's attorney had the opportunity to, but did not, present additional evidence at the resentencing—urged the public defender, on remand, to have the defendant's mental health evaluated and to provide the court with as much information as possible as to the defendant's

behavior and progress, or lack thereof, while in prison. *Id.* ¶ 87. The appellate court also offered the not-so-veiled suggestion that the circuit court should redetermine defendant's fitness before resentencing. *Id.* The appellate court concluded by instructing the trial court, on remand, "to give serious consideration to the attendant characteristics of the defendant's intellectual disability and the fact that this disability 'diminish[es] both [his] culpability and the need for retribution' particularly in the context of this, a nonhomicide offense." *Id.* (quoting *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 74, and citing *Atkins*, 536 U.S. at 320).

¶ 17    In sum, the appellate court, via precedential disposition, extended the requirements of *Miller* and its progeny, via *Atkins*, to adult offenders with intellectual disabilities.

¶ 18                                   ANALYSIS

¶ 19    At its core, the question presented in this case is whether a sentence of life imprisonment, mandatory or *de facto*, is permissible for this intellectually disabled adult twice convicted of a sexual offense perpetrated upon a young child and, if the statute requiring a mandatory natural life sentence does not apply, whether and to what extent *Atkins* factors must be considered prior to the imposition of a *de facto* life sentence.

¶ 20    At the outset, we note that this court, unlike the appellate court, is not constrained in our inquiry by law-of-the-case considerations. As we noted in *People v. Sutton*, 233 Ill. 2d 89, 100 (2009):

    "The law of the case doctrine generally bars relitigation of an issue previously decided in the same case. *People v. Tenner*, 206 Ill. 2d 381, 395 (2002). Thus, the determination of a question of law by an appellate court in the first appeal may be binding on the court in a second appeal. *Krautsack v. Anderson*, 223 Ill. 2d 541, 552 (2006). However, even if the law of the case bars relitigation of the issue in the appellate court, the law of the case doctrine is inapplicable to this court in reviewing a decision of the appellate court. *People v. Triplett*, 108 Ill. 2d 463, 488 (1985). Because this is the first time the case has been before this court, we may review all matters which were properly raised and passed on in the course of the litigation. *Triplett*, 108 Ill. 2d at 488."

¶ 21 Thus, we begin at the beginning, addressing defendant's original sentence and the legislature's determination that an adult convicted of predatory criminal sexual assault of a child, after having been previously convicted of, *inter alia*, aggravated criminal sexual assault, shall be sentenced to a term of natural life imprisonment. See 720 ILCS 5/12-14.1(b)(2) (West 2004) (recodified as 720 ILCS 5/11-1.40(b)(2)).

¶ 22 The constitutionality of a statute is analyzed according to well-established principles. "Statutes are presumed constitutional, and the party challenging the constitutionality of a statute has the burden of clearly establishing its invalidity. A court must construe a statute so as to uphold its constitutionality if reasonably possible. The constitutionality of a statute is a question of law subject to *de novo* review." *People v. Gray*, 2017 IL 120958, ¶ 57. A defendant who has an adequate opportunity to present evidence in support of an as-applied, constitutional claim will have his claim adjudged on the record he presents. See *People v. Holman*, 2017 IL 120655, ¶¶ 49-50

¶ 23 This court addressed the constitutionality of section 12-14.1(b)(2)'s mandatory-life sentencing provision—albeit not as applied to an intellectually disabled defendant—in *People v. Huddleston*, 212 Ill. 2d 107 (2004), wherein this court upheld the constitutionality of the statute against an as-applied, proportionate penalties challenge. Many of the observations in *Huddleston* and authorities cited therein are equally applicable here and require no addition or embellishment. We reference and quote them at length hereafter.

¶ 24 Though the authority of the legislature to prescribe penalties is not without constitutional limitation, this court has repeatedly recognized that the legislature has the power to prescribe penalties for defined offenses, and that power necessarily includes the authority to prescribe mandatory sentences, even if such sentences restrict the judiciary's discretion in imposing sentences. *Id.* at 129 (citing *People v. Miller*, 202 Ill. 2d 328, 336 (2002), and *People v. Taylor*, 102 Ill. 2d 201, 208 (1984)). This defendant challenged his mandatory natural life sentence as violative of, *inter alia*, the proportionate penalties clause of the Illinois Constitution. In *Huddleston* this court noted:

"The proportionate penalties clause provides that '[a]ll penalties shall be determined both according to the seriousness of the offense and with the

- 9 -

objective of restoring the offender to useful citizenship.' Ill. Const. 1970, art. I, § 11. As this court observed in *Taylor*, 'there is no indication [in our constitution] that the possibility of rehabilitating an offender was to be given greater weight and consideration than the seriousness of the offense in determining a proper penalty.' *Taylor*, 102 Ill. 2d at 206. Factors to be considered in determining the seriousness of an offense include the degree of harm, the frequency of the crime, and the risk of bodily injury associated with it. *People v. Hill*, 199 Ill. 2d 440, 454 (2002). The legislature may perceive a need to enact a more stringent penalty provision in order to halt an increase in the commission of a particular crime. *Hill*, 199 Ill. 2d at 454." *Id.* at 129-30.

¶ 25    The legislature perceived that need with respect to those who repeatedly commit sexual offenses against children. Addressing the first constitutional consideration, the "seriousness of the offense," this court, in *Huddleston*, emphasized two factors: the degree of harm and the frequency of the crime.

¶ 26    Speaking to the former, the *Huddleston* court observed:

"Commentators have recognized that, aside from any *physical* injury a child may suffer in a sexual assault, children who are sexually assaulted are subject to chronic *psychological* problems that may be even more pernicious. Sexual assault (rape) has been described as, '[s]hort of homicide, *** the "ultimate violation of self." ' *Coker v. Georgia*, 433 U.S. 584, 597, 53 L. Ed. 2d 982, 992-93, 97 S. Ct. 2861, 2869 (1977), quoting U.S. Dep't of Justice, Law Enforcement Assistance Administration Report, Rape and Its Victims: A Report for Citizens, Health Facilities, and Criminal Justice Agencies 1 (1975)." (Emphases in original.) *Id.* at 135.

The impact on a child can be even more profound than that experienced by an adult.

"Because of their emotional immaturity, children are exceptionally vulnerable to the effects of sexual assault. 45 Ariz. L. Rev. at 209; 39 Duq. L. Rev. at 38. Long-term follow-up studies with child sexual abuse victims indicate that sexual abuse is ' "grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." ' 25 Am. J. Crim. L. at 87, quoting C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2 (1990). The

child's life may be forever altered by residual problems associated with the event. 45 Ariz. L. Rev. at 209; 15 Ga. St. U. L. Rev. at 843." *Id.*

¶ 27 As noted in *Huddleston*, the United States Supreme Court has

" 'sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights.' *New York v. Ferber*, 458 U.S. 747, 757, 73 L. Ed. 2d 1113, 1122, 102 S. Ct. 3348, 3354 (1982). In that regard, the Court has proclaimed the 'prevention of sexual exploitation and abuse of children *** a government objective of surpassing importance.' *Ferber*, 458 U.S. at 757, 73 L. Ed. 2d at 1123, 102 S. Ct. at 3355." *Id.* at 132.

¶ 28 Turning to consider the frequency of the offense and particularly the aspect of recidivism—indicative of the difficulty in rehabilitating sex offenders—the *Huddleston* court first shared the following observations of the Supreme Court:

"As the United States Supreme Court recently reiterated in *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1, 4, 155 L. Ed. 2d 98, 103, 123 S. Ct. 1160, 1163 (2003):

' "Sex offenders are a serious threat in this Nation." *McKune v. Lile*, 536 U.S. 24, 32 (2002) (plurality opinion). "[T]he victims of sex assault are most often juveniles," and "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sex assault." *Id.*, at 32-33.'

In *McKune*, the Supreme Court described the risk of recidivism posed by sex offenders as 'frightening and high.' *McKune v. Lile*, 536 U.S. 24, 34, 153 L. Ed. 2d 47, 57, 122 S. Ct. 2017, 2025 (2002)." *Id.* at 137.

¶ 29 The *Huddleston* court noted that this court had recently acknowledged, in *People v. Donoho*, 204 Ill. 2d 159, 174 (2003), that

"our legislature has responded again and again to the propensity of sex offenders to repeat their crimes and to increases in the incidence of sexual assault and abuse cases. See also *People v. Stork*, 305 Ill. App. 3d 714, 721 (1999) (quoting a legislative declaration referring to ' "the high recidivism rate

of child sex offenders" '), quoting 90th Ill. Gen. Assem., House Bill 157, 1997 Sess." *Huddleston*, 212 Ill. 2d at 137-38.

"Although there is considerable debate over the degree to which treatment of sex offenders may be effective, it *is* clear that state legislatures may respond to what they reasonably perceive as a 'substantial risk of recidivism.' See *Smith v. Doe*, 538 U.S. 84, 103, 155 L. Ed. 2d 164, 183-84, 123 S. Ct. 1140, 1153 (2003) ('Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism. The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class')." (Emphasis in original.) *Id.* at 138.

¶ 30 Those reasonable concerns over the substantial risk of child sex offender recidivism have been addressed by means of two principal approaches: "Some statutes seek to protect children once an offender is released from state custody by monitoring or restricting his or her movement and access to children. Other enactments call for longer sentences of imprisonment, so that the offender's opportunity to reoffend is foreclosed during the period of incarceration." *Id.*

¶ 31 We are concerned here with the latter approach—a statutory approach this court found constitutional, under our proportionate penalties clause, as applied to Huddleston. After noting that "a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community" (*id.* at 130), this court concluded that the application of the statutorily mandated natural life sentence did not meet that standard as applied to Huddleston (*id.* at 145).

¶ 32 So, how is this defendant different from Huddleston? What about this defendant specifically, or the class to which he belongs (the intellectually disabled), warrants a different result? In approaching that question, three differences come to mind, all of which have been subjects of comment in the case law: culpability, future dangerousness, and rehabilitative potential—the latter particularly important, as it is the second consideration in our proportionate penalties clause.

¶ 33 With respect to culpability, we consider and take as a given the characteristics of the intellectually disabled that the Supreme Court has identified as relevant to

sentencing in the context of capital sentencing, emphasizing at the outset that whether a defendant is subject to execution is a very different issue than whether a mandatory natural life sentence is constitutionally permissible for an adult.[8] As noted heretofore, in the context of capital punishment for an intellectually disabled defendant, the Supreme Court, in *Atkins*, determined that an intellectually disabled person's culpability is lessened by reason of a diminished capacity (1) to understand and process information, (2) to communicate, (3) to abstract from mistakes and learn from experience, (4) to engage in logical reasoning, (5) to control impulses, and (6) to understand others' actions and reactions, so as to be more susceptible to manipulation and pressure. *Atkins*, 536 U.S. at 318. The Court concluded those characteristics resulted in reduced culpability and precluded a sentence of death. *Id.* at 320.[9] Presumably, our own legislature considered those intellectual deficits in adding "intellectually disabled" to the list of mitigating factors to be considered in sentencing. See Pub. Act 86-903 (eff. Jan. 1, 1990) (adding 730 ILCS 5/5-5-3.1(a)(13)); see also Pub. Act 97-227, § 145 (eff. Jan. 1, 2012) (changing "mentally retarded" to "intellectually disabled").

¶ 34        Although *Atkins* abrogated *Penry v. Lynaugh*, 492 U.S. 302 (1989), it did not dispute the Court's observation therein that the defendant's mental retardation represented a "two-edged sword" that "diminish[ed] his blameworthiness for his crime even as it indicate[d] that there is a probability" of future dangerousness (*id.*

---

[8]As noted in the appellate court's well-reasoned decision in *People v. Rhoades*, 2018 IL App (4th) 160457, the Supreme Court has "held 'a capital sentence is cruel and unusual under the Eighth Amendment if it is imposed without an individualized determination that that punishment is "appropriate"—whether or not the sentence is "grossly disproportionate." ' " *Rhoades*, 2018 IL App (4th) 160457, ¶ 24 (quoting *Harmelin*, 501 U.S. at 995). However, the Court declined to extend this individualized determination requirement to mandatory life sentences for adults. *Harmelin*, 501 U.S. at 995. "As a result, the defendant's mandatory life sentence in *Harmelin* did not constitute a cruel and unusual punishment under the eighth amendment and neither does the mandatory nature of defendant's life sentence in this case." *Rhoades*, 2018 IL App (4th) 160457, ¶ 24, *appeal denied*, No. 124321 (Ill. Jan. 31, 2019) (addressing the same statutory provision at issue here); see also *id.* ¶ 14 (discussing Justice Kennedy's concurrence in *Harmelin*, 501 U.S. at 997 (Kennedy, J. concurring in part and concurring in the judgment, joined by O'Connor and Souter, JJ.), which was recognized as controlling in *Graham v. Florida*, 560 U.S. 48, 59-60 (2010)).

[9]The Court in *Atkins* noted that the Court had previously identified retribution and deterrence of capital crimes by offenders as the social purposes served by the death penalty. The Court observed, unless the imposition of the death penalty on a mentally retarded person measurably contributes to one or both of those goals, it is nothing more than the purposeless and needless imposition of pain and suffering and, hence, an unconstitutional punishment. *Atkins*, 536 U.S. at 319. The Court rejected the efficacy of capital punishment in service of those penological goals.

at 324), an observation the Court subsequently reiterated in *Brewer v. Quarterman*, 550 U.S. 286, 288-89 (2007).

¶ 35　　　　Indeed, this court has held that future dangerousness of an intellectually disabled adult is a factor properly considered as an aggravator in sentencing, given an appropriate evidentiary basis. While acknowledging that an intellectual disability is a statutory factor in mitigation, this court, in *People v. Heider*, 231 Ill. 2d 1, 20-21 (2008), nonetheless spoke to the aggravating aspect of intellectual disability:

> "[A] trial court might conclude, from the evidence, that a defendant's mental retardation rendered him dangerous to the community, and for this reason decided to increase the defendant's prison sentence. If, for example, the evidence established that a defendant had diminished impulse control as a result of his mental deficiency, and if that lowered impulse control rendered him a threat to the community, a trial court might conclude that, because of the defendant's future dangerousness resulting from his lack of control, the defendant should be given a greater prison sentence in the interest of protecting the public. See *People v. McNeal*, 175 Ill. 2d 335, 370, 367-71 (1997). However, where mental retardation indicates future dangerousness, it is not the mental retardation that is being used as the aggravating factor. Rather, it is the future dangerousness that *results* from the mental retardation that is the aggravator. In our view, there is nothing improper in considering the effects of mental retardation in this way, so long as the evidence supports the conclusion that the defendant poses a future danger."[10] (Emphasis in original.)

In *Heider*, the evidence did not support the circuit court's characterization of the defendant as a " 'sexual predator *** who commits crimes against young people,' " because "[t]here was nothing in his prior history that even remotely resembled a violent crime or an offense of a sexual nature." *Id.* at 23.

¶ 36　　　　Here, there is. Defendant has twice committed sexual offenses against children. Sexual recidivism, and the future dangerousness it entails, was obviously a factor in the legislature's determination that a natural life sentence is warranted for

---

[10]Mandatory sentencing based on the commission of *repeated* sexual offenses against children was not at issue in *Heider*.

- 14 -

recidivists. With respect to this intellectually disabled defendant, we note that some of the very factors that the Court in *Atkins* found *reduced culpability*—diminished capacity (1) to understand and process information, (2) to communicate, (3) to abstract from mistakes and learn from experience, (4) to engage in logical reasoning, (5) to control impulses, and (6) to understand others' actions and reactions (*Atkins*, 536 U.S. at 318)—are what make him *a continuing danger to reoffend*.

¶ 37    We turn now to the second prong of our constitution's proportionate penalties clause and consider the prospect of rehabilitation. In *Huddleston*, this court concluded that defendant's rehabilitative potential did not outweigh the legislature's determination as to the seriousness of repeated sexual offenses and the need for a mandatory natural life sentence. That defendant experienced no intellectual deficits, a fact that would seemingly weigh in favor of greater rehabilitative potential than that of a defendant, such as this defendant, with intellectual deficits. The factors identified in *Atkins* logically impair rehabilitative potential, and, unlike a juvenile, whose mental development and maturation will eventually increase that potential, the same cannot generally be said of the intellectually disabled over time.

¶ 38    The Supreme Court has recognized as much. In *Heller v. Doe*, 509 U.S. 312, 323 (1993), the court stated:

> "Mental retardation is a permanent, relatively static condition [citation], so a determination of dangerousness may be made with some accuracy based on previous behavior. We deal here with adults only, so almost by definition in the case of the retarded there is an 18-year record upon which to rely."

Dr. Marva Dawkins, a clinical psychologist who examined Coty for fitness, also observed that "mental retardation is a lifelong condition," adding, at defendant's age, "learning is becoming more and more difficult."

¶ 39    While the Supreme Court's decision in *Miller is* based in part upon the lesser culpability of youth—a characteristic the *Atkins* Court pronounced shared by the intellectually disabled—the *Miller* Court's decision is founded, principally, upon the *transient* characteristics of youth, characteristics not shared by adults who are intellectually disabled. Referencing its earlier decisions in *Roper v. Simmons*, 543

U.S. 551 (2005), and *Graham v. Florida*, 560 U.S. 48, 68, 75 (2010), the *Miller* Court enunciated the critical differences between juveniles and adults, and the bases for the Court's decision:

> "Our decisions rested not only on common sense—on what 'any parent knows'—but on science and social science as well. *Id.*, at 569. In *Roper*, we cited studies showing that ' "[o]nly a relatively small proportion of adolescents" ' who engage in illegal activity ' "develop entrenched patterns of problem behavior." ' *Id.*, at 570 (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003)). And in *Graham*, we noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' 560 U.S., at 68. We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his ' "deficiencies will be reformed." ' *Ibid.* (quoting *Roper*, 543 U.S., at 570).
>
> *Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders ***." *Miller*, 567 U.S. at 471-72.

¶ 40   The enhanced prospect that, as the years go by and neurological development occurs, deficiencies will be reformed—is not a prospect that applies to this intellectually disabled defendant, who was 46 years old when he committed this, his second sexual offense against a child. The rehabilitative prospects of youth do not figure into the sentencing calculus for him.

¶ 41   We note in passing—as the appellate court observed in *Rhoades*—that the Supreme Court's decision in *Harmelin v. Michigan*, 501 U.S. 957 (1991), survives *Miller*, as Justice Kagan made clear:

> "The States (along with JUSTICE THOMAS) first claim that *Harmelin v. Michigan*, 501 U.S. 957 (1991), precludes our holding. The defendant in *Harmelin* was sentenced to a mandatory life-without-parole term for possessing

more than 650 grams of cocaine. The Court upheld that penalty, reasoning that 'a sentence which is not otherwise cruel and unusual' does not 'becom[e] so simply because it is "mandatory." ' *Id.*, at 995. We recognized that a different rule, requiring individualized sentencing, applied in the death penalty context. But we refused to extend that command to noncapital cases 'because of the qualitative difference between death and all other penalties.' *Ibid.*; see *id.*, at 1006 (KENNEDY, J., concurring in part and concurring in judgment). According to Alabama, invalidating the mandatory imposition of life-without-parole terms on juveniles 'would effectively overrule *Harmelin*.' Brief for Respondent in No. 10-9646, p. 59 (hereinafter Alabama Brief); see Arkansas Brief 39.

We think that argument myopic. *Harmelin* had nothing to do with children and did not purport to apply its holding to the sentencing of juvenile offenders. We have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children. Capital punishment, our decisions hold, generally comports with the Eighth Amendment—except it cannot be imposed on children. See *Roper*, 543 U.S. 551; *Thompson*, 487 U.S. 815. So too, life without parole is permissible for nonhomicide offenses—except, once again, for children. See *Graham*, 560 U.S., at 75. Nor are these sentencing decisions an oddity in the law." *Miller*, 567 U.S. at 480-81.

¶ 42    So, was the natural life sentence originally imposed on this defendant, pursuant to the mandate of the statute, unconstitutional, under our proportionate penalties clause, as applied to him? Was it, taking account of all relevant considerations—including defendant's prior convictions for aggravated battery and attempted armed robbery and the fact that this was his second sexual offense against a child—"cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community?" See *Huddleston*, 212 Ill. 2d at 130. Given the foregoing, we believe the answer is no. While defendant may be less culpable, because of his disability, than the defendant in *Huddleston*, the characteristics of his predominantly static condition and his age make him less likely to be rehabilitated and thus more likely to reoffend. The whole point of the mandatory, natural life sentence for repeat sex offenders is to protect children by rendering it impossible for the incorrigible offender to reoffend.

¶ 43     As this court observed in *People v. Rizzo*, 2016 IL 118599, ¶ 37 (quoting *Miller*, 202 Ill. 2d at 339, quoting *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 421-22 (1894)), "the fact that the legislature 'has authorized a designated punishment for a specified crime' *itself* says something about the 'general moral ideas of the people.' " (Emphasis in original.) "The legislature's discretion in setting criminal penalties is broad, and courts generally decline to overrule legislative determinations in this area unless the challenged penalty is clearly in excess of the general constitutional limitations on this authority." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). We decline to do so here. The penalty defendant challenged in his initial appeal was not, as applied to him, clearly in excess of the legislature's constitutional authority to prescribe.

¶ 44     The original sentence of natural life imprisonment did not violate the proportionate penalties clause. In so holding, the appellate court erred. Defendant was not entitled to resentencing based on a violation of the proportionate penalties clause. We will speak to the procedural consequences of that error shortly.

¶ 45     However, first we address, briefly, one of the two contentions of defendant's cross-appeal, that his sentence violates the eighth amendment of the United States Constitution. We note that appellate decisions, including the second in this case, have aptly pointed out that this court has not spoken consistently on the relationship between our proportionate penalties clause and the eighth amendment. See 2018 IL App (1st) 162383, ¶ 58; *People v. Horta*, 2016 IL App (2d) 140714, ¶ 62.[11] However, as the court in *Horta* observed, if a sentence passes muster under the proportionate penalties clause, *i.e.*, it is found not to be "cruel, degrading, or so

---

[11]In *Horta*, 2016 IL App (2d) 140714, ¶ 62, the appellate court observed:
"[O]ur supreme court has not spoken consistently on whether the latter [the proportionate penalties clause] is coextensive with the former [the eighth amendment] or provides greater protections. Compare *People v. Patterson*, 2014 IL 115102, ¶ 106 (stating that proportionate-penalties clause is 'co-extensive with the eighth amendment's cruel and unusual punishment clause'), with *People v. Clemons*, 2012 IL 107821, ¶ 40 (stating that proportionate-penalties clause, 'which focuses on the objective of rehabilitation, went beyond the framers' understanding of the eighth amendment'). However, there is no dispute that the reach of the state provision is at least as great as that of the federal one. Thus, we shall limit our analysis to the proportionate-penalties clause. If defendant's challenge succeeds on that ground, we need not decide whether it would also succeed under the eighth amendment; if it fails under the proportionate-penalties analysis, we may assume that it would not succeed as an eighth-amendment claim either ***."

wholly disproportionate to the offense committed as to *shock the moral sense of the community*," after considering "the seriousness of the offense *** with the objective of restoring the offender to useful citizenship" (emphasis added) (see *Huddleston*, 212 Ill. 2d at 129-30), then it would seem to comport with the contemporary standards of the eighth amendment as explained in *Graham*, 560 U.S. at 58.[12] To the extent that the eighth amendment requires consideration—as stated in *Graham*—of the "moral judgment" and "mores" of a wider, *national* community, we note that defendant acknowledges the State's observation that "[c]ourts across the country that have addressed the issue *** have declined to extend *Atkins* to noncapital sentences or *Miller* to the intellectually disabled." We take this to mean that the "moral judgment" and "mores" of the nation are not inconsistent with our own in this matter. In short, we reject defendant's eighth amendment argument.

¶ 46  We now revisit the unusual procedural posture of this case. In light of our analysis, the mandatory natural life sentence originally imposed upon defendant, pursuant to section 12-14.1(b)(2) of the Criminal Code (720 ILCS 5/12-14.1(b)(2) (West 2004)), was constitutional as applied to him. It was the proper sentence. The original appellate panel erred in ordering resentencing. Defendant's argument that the resentencing court abused its discretion is, in our view, moot. And, with respect to the decision of the second appellate panel, what defendant did or did not do while in prison, after the mandatory natural life sentence was imposed, is also irrelevant.

¶ 47  But there *is* now a 50-year *de facto* life sentence—which might be considered a reduced sentence—that resulted from defendant's initial appeal. The question is whether reimposition of the original natural life sentence mandated by statute would constitute an improper increase in defendant's sentence. The question would seem largely academic—natural life versus *de facto* life.

---

[12]To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to " 'the evolving standards of decency that mark the progress of a maturing society.' " Estelle v. Gamble, 429 U.S. 97, 102 (1976) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion)). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.' " Kennedy v. Louisiana, 554 U.S. 407, 419, 128 S. Ct. 2641, 2649, 171 L.Ed.2d 525 (2008) (quoting Furman v. Georgia, 408 U.S. 238, 382, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting))." Graham v. Florida, 560 U.S. 48, 58 (2010).

¶ 48 Section 5-5-4(a) of the Unified Code of Corrections (730 ILCS 5/5-5-4(a) (West 2012)) provides:

> "Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different offense based on the same conduct which is more severe than the prior sentence less the portion of the prior sentence previously satisfied unless the more severe sentence is based upon conduct on the part of the defendant occurring after the original sentencing."

That provision is directed to the circuit court. However, this court has spoken to a somewhat similar situation in *People v. Castleberry*, 2015 IL 116916, ¶ 24, where this court rejected the State's argument that *the appellate court* had the authority, under Rule 615(b) (Ill. S. Ct. R. 615(b)), to *increase* a criminal sentence on appeal by imposition of mandatory sentencing enhancements that should have been a part of defendant's sentence. We noted, however, that the State *could* seek to compel compliance with a mandatory sentencing requirement via an action for *mandamus*.

¶ 49 Of course, the matter of a proper sentence is neither before the circuit court nor the appellate court—it is before this court. Article VI, section 16, of the Illinois Constitution vests this court with supervisory authority over all the lower courts of this state. Ill. Const. 1970, art. VI, § 16; *In re J.T.*, 221 Ill. 2d 338, 347 (2006). "This authority is 'unlimited in extent and hampered by no specific rules or means for its exercise.' " *People v. Salem*, 2016 IL 118693, ¶ 20 (quoting *In re Estate of Funk*, 221 Ill. 2d 30, 97 (2006)). "It is 'an "unequivocal grant of power." [Citation.] This authority extends to "the adjudication and application of law and the procedural administration of the courts." ' " *Id.* (quoting *People v. Whitfield*, 228 Ill. 2d 502, 521 (2007)).

¶ 50 We believe our supervisory authority, and the reach of our review under the authority of *Sutton*, 233 Ill. 2d 89, would allow us to reinstate defendant's original sentence of natural life imprisonment. On the other hand, we could reverse the decision of the appellate court now before us, allowing the *de facto* life sentence to stand. The State only asks that we "reverse the appellate court's judgment finding defendant's sentence unconstitutional and affirm the appellate court's judgment finding that the trial court did not abuse its discretion in sentencing defendant to fifty years in prison." Given the parameter of the State's request for relief, and no

practical difference between a natural life sentence and a *de facto* life sentence, we choose to allow the latter to stand.

¶ 51                                  CONCLUSION

¶ 52        For the foregoing reasons, we reverse the judgment of the appellate court, as we find no violation of defendant's constitutional rights, and we reject the defendant's contentions in his cross-appeal.


¶ 53        Appellate court judgment reversed.

¶ 54        Circuit court judgment affirmed.