2023 IL App (1st) 172005

1-17-2005

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 18394 |
| | ) | |
| DANIEL GARCIA, | ) | Honorable |
| | ) | Kevin Sheehan, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice C.A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     Daniel Garcia was convicted of three counts of aggravated criminal sexual assault and one count of aggravated kidnapping and sentenced to 25 years' imprisonment on each of the four counts, to run consecutively, for a total of 100 years. Garcia appeals, arguing that the trial court erred in denying his motion for a new trial based on newly discovered evidence and ineffective assistance of trial counsel. He also contends that his 100-year sentence violated the United States and Illinois Constitutions and was otherwise excessive. We affirm the judgment of Garcia's

conviction but vacate his sentence and remand to the trial court for a new sentencing hearing.

¶ 2                                    I. BACKGROUND

¶ 3      Prior to trial in this case, in September of 2015, the assistant public defender who represented Garcia at the time requested a behavioral clinical exam (BCX) to evaluate Garcia for sanity at the time of the offense, citing Garcia's claim that he had "mental health issues."

¶ 4      Following the BCX, the psychologist indicated that in his meeting with Garcia, Garcia's "affect was stable" and his thought process was "logical and goal directed." Garcia provided a vague account of audio and visual hallucinations, which are severe psychotic symptoms, and "highly inconsistent with his calm, logical and friendly demeanor." Garcia reported a history of learning disability and past treatment for "bipolar," but provided vague and evasive responses to follow-up questions. Garcia denied symptoms of psychosis or mania at the time of his arrest, indicating he "was feeling fine, just a little depressed about [his] friend." He gave a vague account description but was evasive again when asked follow-up questions.

¶ 5      The psychologist reviewed Garcia's medical records from Cermak Hospital where Garcia had been given a mental health screening three days after his arrest in this case. During that screening, Garcia denied symptoms of psychosis or mania and no indications of either were observed. He was then placed in the general jail population.

¶ 6      Notes during follow-up visits with the psychologist in 2014-2015 revealed that Garcia displayed no external indication of psychosis or mania. Due to Garcia's vague account of hallucinations, and his manipulative behavior, there was "strong concern" for exaggeration of symptoms "because [Garcia] thinks it will help with his case and being granted [mental health] probation." Garcia was not prescribed any psychotropic medication, as Garcia's issues appeared to be behavioral, not mental illness. In addition, the psychologist reviewed the police reports that

showed Garcia "took steps to obscure his identity," suggesting that Garcia understood the criminal nature of his actions. Based on his assessment of the available information, the psychologist opined that Garcia was legally sane at the time of the offense.

¶ 7     The issue of Garcia's mental health arose again during bond hearings in November and December of 2015, during which defense counsel stated that Garcia had not worked for the last four to five years because of a "bipolar disorder" and Garcia received social security disability income. The court inquired as to whether defense counsel was seeking a second opinion as to sanity. Defense counsel responded that he was not.

¶ 8     Four days prior to the start of trial, attorney Frank Avila filed his appearance for Garcia. The court noted that Garcia hiring a new attorney on the eve of trial appeared to be a dilatory tactic, but allowed Avila to file his appearance, nevertheless. Garcia was advised of the sentencing possibilities if convicted after a trial.

¶ 9     The State filed a motion to prevent Garcia from introducing evidence of any prior sexual interaction between he and the victim. The State also presented an oral motion *in limine* to bar Garcia from introducing evidence of his mental health history, if any existed. Avila responded that he was "not anticipating doing that" but stated Garcia was bipolar and had been receiving social security prior to his incarceration. The court indicated that any evidence of Garcia's mental health history was "not coming in" because there was no affirmative defense of insanity and there is no other defense that has to do with mental illness.

¶ 10     At trial, C.P. testified that she was employed as an esthetician and was working on October 2, 2014, at a fashion show in downtown Chicago. After the event, she went to an after-party at a nearby hotel with John Castilla and another woman. She was wearing leather shorts, a black sweater, a leather jacket, and black shoes. While they were at the party, John invited C.P.

to his lake house in Wisconsin. C.P. agreed, and they left the party between 11:30 p.m. and midnight.

¶ 11   John drove C.P.'s 2012 Hyundai Sonata because he had not been drinking and knew where they were headed. C.P. consumed two drinks and was not intoxicated but did not want to drive because it was raining. John stopped to get gas at a gas station at Irving Park Road and Pulaski Road in Chicago. He started the gas pump, and then went inside the store. C.P. remained in the car.

¶ 12   As C.P. sat in her car, Garcia opened the car door and jumped into the driver's seat. C.P. did not know Garcia. She screamed, and Garcia punched her repeatedly in the face, while cursing at her and telling her to "shut up." She tried to grab the steering wheel in an attempt to crash the car, but Garcia was able to drive it out of the gas station. C.P.'s attempt to block his punches with her hands resulted in most of her acrylic fingernails breaking off.

¶ 13   As Garcia drove, he told C.P. that he was with the cartel and was there to kill her, and that they had kidnapped the man she was with and threw him in the trunk of a car. Garcia said that he had a gun. C.P. told Garcia that she needed to get home to her son, hoping Garcia would see her as a mother who was raising a child. Garcia continued to drive and then parked.

¶ 14   After he parked, Garcia grabbed C.P.'s breasts. When she resisted, he choked her with both hands around her neck. C.P. could not breathe and nearly lost consciousness. He then ripped the crotch out of C.P.'s shorts and inserted his penis into her vagina, while commenting about her liking what he was doing. He kissed her and licked her face as he touched her "all over" until he ejaculated. After he ejaculated, Garcia returned to the driver's seat and grabbed C.P. by her hair and forced her to "suck his penis" while making vulgar, sexual comments. Then, he grabbed her by her hair and made her get on top of him. Garcia threatened to kill her. Garcia again put his

penis in C.P.'s vagina. Garcia also inserted his finger into C.P.'s anus while he had his penis in her vagina. During this interaction, C.P. suffered a burn to her knee from the center console.

¶ 15    C.P. did not consent to any of these acts. Garcia repeatedly threatened to kill her and told her he had a gun. Garcia climbed on top of her in the front passenger seat again, and again inserted his penis into her vagina. Garcia again ejaculated inside her vagina and onto the outside of her vagina and inner legs.

¶ 16    Garcia then began looking through the car for money. C.P. told him that she did not have any money but led him to Chase bank in Orland Park near her home. As he drove, Garcia played with C.P.'s hair and rubbed her shoulders, assuring her everything was going to be okay. He told C.P. about his life, his daughter, and his deceased mother. C.P. continued to tell Garcia about her son, so that maybe Garcia would see that she was "human as a mother[,] as someone who wanted to go home alive." When they arrived at the bank, Garcia asked for C.P.'s debit card. After telling Garcia that she needed the money for rent, C.P. gave Garcia her debit card. Garcia withdrew $200 and handed C.P. $40 afterward, telling her that "if [she] helped him he will help [her]."

¶ 17    Garcia then drove C.P. home and said he would come back the next day. Garcia had taken C.P.'s cell phone from her earlier in the night. In order to get her cell phone back, C.P. asked him how she would get ahold of him the next day. Garcia programmed his phone number into C.P.'s cell phone and gave it back to her. C.P. ran into her house.

¶ 18    C.P. woke up her sister Polly. Polly noted that C.P. was disheveled, had marks on her face and neck, and "her clothes were all torn off her." C.P. appeared "scared" and "in shock" and told her sister that she had been raped. Polly called 911, and C.P. spoke to the police. C.P. was transported to Palos Hospital, where she submitted to a sexual assault kit. C.P.'s shorts with the

crotch torn out were admitted into evidence, as was the recording of the 911 call.

¶ 19　The nurse and doctor who treated C.P. in the emergency department testified that C.P. was crying and her makeup was "smeared all down her face and she was just very anxious." C.P. relayed the details of her time with Garcia in the car, including his repeated sexual assaults. The nurse documented C.P.'s statements. She also noted injuries to C.P.'s body, including a "bruising hematoma on her forehead." She further noted that C.P.'s shorts were ripped, and a sexual assault kit was conducted. C.P.'s blood sample, head and pubic hair combings, as well as oral, anal, and vaginal swabs were collected over the course of an approximately two-hour long process.

¶ 20　The doctor testified that C.P. had an injury to her forehead that was consistent with being punched and identified injuries in several photographs, taken in the days following the attack, as being consistent with the actions C.P. had reported. These photographs showed marks on C.P.'s face and neck, indicating possible punches and strangulation, and an acute injury to her knee. The doctor also opined that C.P.'s broken fingernails could be consistent with blocking punches. He did not note any injuries to her vagina or anus but testified that it is not unusual that a sexual assault victim would not have physical injuries to those areas, as they have "accommodation and flexibility and elasticity that does allow it to take you know some degree of trauma." A urinalysis showed "trace blood" in her urine, which "means that there was evidence of red blood cells in the urinalysis from her bladder or urethral track[,] which can result possibly from trauma or any other number of things." C.P. was prescribed medications to minimize the risk of her contracting any sexually transmitted diseases or HIV and was educated as to an option she could seek to prevent pregnancy.

¶ 21　At approximately 4:15 a.m., on October 3, 2014, Garcia was pulled over driving C.P.'s

car a half a mile from her house. An evidence technician recovered a broken fingernail located on the right front side floor and observed white stains on the back of the passenger seat. No weapons were found. C.P. identified Garcia in a lineup later that day.

¶ 22    When Garcia drove out of the gas station with C.P., John Castilla's phone was in the car. John learned what happened to C.P. from a mutual friend and went to the police station, where he spoke with detectives who returned his cell phone. John's phone verified the purchases he made at the gas pump and in the gas station store that night, as his credit card company sent him text messages every time he used his credit card.

¶ 23    Chicago Police Detective Mona Majeed testified that none of the cameras at the gas station that would have captured the relevant areas of the crime were recording at the time of the crime, and the video from Chase bank was not available. She also testified that the phone number that Garcia had entered into C.P.'s phone was likely a "pay-as-you-go type phone," with no subscriber or service provider information available.

¶ 24    Detective Majeed and her partner, Detective Aileen O'Grady, interviewed Garcia after his arrest. Garcia consented to provide a DNA sample, and a buccal swab was taken. A lineup was conducted wherein C.P. identified Garcia as the person who kidnapped her, sexually assaulted her, and took her car. Forensic testing from samples gathered for the sexual assault kit revealed that "semen was identified on the vaginal, anus and oral swabs." DNA analysis showed that Garcia's DNA was on the vaginal and anal swabs, and he could not be excluded from the oral swabs.

¶ 25    The State rested. Garcia indicated that he wished to testify. The State renewed its motion *in limine* to bar Garcia from testifying "that he's taking any type of medication, has any type of mental health history or anything like that, that the State has—and the State has not been

tendered any information of such." The motion was granted with no objection from the defense.

¶ 26    Garcia testified that, in the early morning hours of October 3, 2014, he was walking in the area of Irving Park Road and Elston Avenues in Chicago, when C.P. pulled up in her silver car and said "hello" and asked "how are you doing?" Garcia denied having a gun or forcing his way into the car. Garcia testified that after he got into C.P.'s car, she drove "[u]p Elston" "[t]owards Pulaski Road, stopped the car to smoke, and "kind of start[ed] touching [him]." According to Garcia, they "had intercourse," and he did not force himself on her. The intercourse lasted for "[n]o more than, like, ten minutes," and "[a]fter that, [they] were done."

¶ 27    C.P. then jumped into the passenger seat and Garcia started driving because "[s]he was intoxicated." Garcia drove her home, stopping first at a Chase bank, where she used the ATM and withdrew $200. Garcia dropped her off and she programed his phone number into her phone. He never told her his name, but she told him her name. After dropping her off, he went to the gas station no more than 10 minutes from her house. Garcia denied having a weapon or punching C.P. and stated they were together no more than an hour and had "more than one variety of a type of sex."

¶ 28    On cross examination, Garcia testified that he met C.P. at a party in 2013. According to Garcia, when C.P. approached him in her car at Irving Park and Elston, she told him to get in, which he did, but did not know why. Garcia testified that he was coming from the funeral of a "good friend," but could not remember his friend's first name. He testified his friend dropped him off in the area of "Irving and Pulaski," although it was in the complete opposite direction of his home on the west side of Humboldt Park. He was "surpris[ed]" that C.P. "just appeared on the north side of the city on this random day," because he knew she lived in the south suburbs.

¶ 29    Garcia further testified that after C.P. ordered him to get in, she drove to an unknown side

street, stopped, smoked "[s]ome weed" (but Garcia did not), and "[t]hen [they] had intercourse." Garcia admitted that he had vaginal intercourse with C.P. in the passenger seat and that she had climbed on top of him, but denied having any other form of sexual intercourse with C.P. Later, however, he acknowledged that he put his penis in C.P.'s mouth, claiming she grabbed his penis when he was driving her home. He denied ejaculating and said he told her to stop because he was driving, and so she stopped and fell asleep on his arm. Garcia also denied putting his fingers in C.P.'s anus, and stated he only put his penis in her vagina one time. Garcia repeatedly claimed that he did not want to have sex with C.P. that night, and although she did not "technically" rape him, "she did force herself on top of [him]" and forced his penis into her vagina and her mouth.

¶ 30    According to Garcia, it was C.P.'s idea to stop at the bank, and she was the one who withdrew $200 from the ATM and gave him $40 to get gas. Also, according to Garcia, C.P. ripped her own shorts before they had sex. Garcia denied knowing how her fingernails had broken. He also denied seeing any red marks on C.P.'s neck in the State's exhibits and did not know how C.P. injured her knee as shown in the photos. Garcia conceded that it was a good night for him—he had sex with a pretty woman, she gave him money afterwards, and she then gave him her car and a spare set of keys.

¶ 31    Garcia conceded that after he was stopped by the police, he told the detectives that he was driving his girlfriend's car but denied being unable to tell them his girlfriend's name. He admitted he initially told the detectives he and C.P. had only kissed, but denied admitting they had sex only after the detectives told him of the likelihood of finding his DNA on C.P. He also denied telling the detectives that "if [he] wanted, [he] could have left [C.P.] in a ditch."

¶ 32    Detective Majeed testified in rebuttal that Garcia told her that he was driving his girlfriend's car, but could not remember her name, and that he and C.P. only kissed. She testified

that, after explaining that his DNA would likely be found on the victim or at the crime scene, Garcia changed his story and stated the woman had given him oral sex. He told the detectives that he put his number in her phone, and that "if [he] wanted, [he] could have left her in a ditch."

¶ 33    Following closing arguments, the jury found Garcia guilty of all three counts of aggravated criminal sexual assault and one count of aggravated kidnapping. Prior to sentencing, defense counsel filed a motion for new trial, alleging, in pertinent part, that "[s]ometime within the last month, [counsel] discovered evidence that Garcia has an intelligence quotient of 70 (mild mental retardation), suffers from bipolar disorder, and has memory issues." He asserted that Garcia's relatives happened upon the evidence while going through the family's storage boxes. He argued that Garcia was entitled to a new trial because this "newly discovered evidence," if discovered prior to trial, would have changed the outcome of the trial by explaining why Garcia had memory lapses and providing a viable insanity defense. Defense counsel attached the following to the motion: a release of health information from Advocate Health Care, signed by Garcia July 7, 2007; a letter to Garcia from Advocate Behavior Health Center, indicating Garcia had an out-patient intake appointment on July 11, 2007; a decision of a Social Security Disability Hearing officer (SSR), dated February 22, 2006; a social work treatment summary from January 2004; and a Chicago Public School Report of a Psychological Evaluation from April 23, 2003.

¶ 34    The 2003 psychological evaluation, performed when Garcia was 16 years old, showed that Garcia had been placed in a therapeutic day school due to "aggressive and assaultive behaviors" and that he was in counseling and speech/language services. He had no attention or concentration difficulties during the evaluation, but his response style was "impulsive." It was also noted that Garcia's "cognitive ability [wa]s within the borderline range" and his "inappropriate behave/feelings" score was borderline.

¶ 35    The January 2004 social work treatment summary indicated that, in spring of 2002, Garcia had been "arrested and charged with attempted murder, and possession of a weapon," and was placed on probation. Garcia tested positive for drugs while on probation and attended a drug rehabilitation center. After he was released from probation, Garcia was charged with possession of an illegal substance. Garcia was impulsive, often yelling out for no reason; disrespectful; and verbally aggressive. Treatment goals included anger management, helping him take responsibility for his own actions, and impulse control.

¶ 36    The SSR indicated that Garcia began receiving benefits when he was 13 years old due to learning disabilities and speech and language delays. His benefits were terminated when he turned 18 because he failed to provide necessary documentation. The termination was later reviewed, based on Garcia's allegation that he had adult disability due to "Learning Disability and [ADHD]," with Garcia and his mother providing testimony, a psychiatric evaluation dated November 2005, and his school individualized education program (IEP) from 2005.

¶ 37    The 2005 IEP showed that at 18 years old, Garcia was receiving services for a learning disability and emotional behavior problems. He required adult supervision for all nonacademic and extra-curricular activities, as he often "provoke[d] peers and f[e]d into negative behavior." He was disrespectful toward authority figures when he was frustrated or angry. He had attention seeking behavior and often got frustrated by his low academic achievement and inability to express himself. A 2005 psychiatric evaluation showed an IQ of 70, in "the lower half of the borderline range of intellectual functioning."

¶ 38    Garcia, who was 19 at the time of the termination of disability benefits hearing, testified that his behavior was "fine," he had no trouble with the law, and was not involved with gangs or drugs or alcohol. The hearing officer found that Garcia "testified very well on his own behalf. He

did not have a problem comprehending any questions directed to him. He had a very good memory about basketball scores or different players *** he loves the sport." In finding Garcia disabled, the hearing officer noted that Garcia had been diagnosed with "Severe learning Disorder and a history of Severe Conduct Disorder[,] *** [ADHD] and Speech and Language Delays." The hearing officer further noted the limitations on Garcia's cognitive and social interaction skills, where Garcia gets "frustrated," can be "disrespectful to authority figures," has limitations on his ability to interact appropriately with co-workers and the general public, and exhibits "impulsive behavior and low self-esteem." The hearing officer reinstated Garcia's social security benefits, based on the adult criteria for disability.

¶ 39     At the hearing on Garcia's motion for new trial, defense counsel stated that these documents could not have been discovered sooner because he came on the case "somewhat late in the game," Garcia's mother is deceased, and Garcia does not have a relationship with his father. Defense counsel pointed out that the documents showed Garcia "has an IQ of 70," meaning Garcia is "developmentally disabled but borderline or mildly retarded," and argued that Garcia has "bipolar or schizophrenia," as Garcia self-reported to the investigator who prepared his presentence investigation report (PSI). Counsel further stated that the documents show Garcia "has memory issues, a specific disorder and a primary grade academic level." Counsel argued that had he known about these issues sooner, he could have presented the case differently and could have explained to the jury Garcia's "speech and his ability to remember specific details."

¶ 40     Counsel conceded that Garcia had told him he was receiving social security disability benefits prior to trial and acknowledged that he had so informed the court prior to trial. Counsel also admitted that he was aware of Garcia's "bipolar or schizophrenia condition" prior to trial and was aware of the BCX before he filed his appearance. Nevertheless, counsel argued that

Garcia was entitled to a new trial.

¶ 41   The State argued that the documents provided by Garcia showed that Garcia "had a learning disability and an attention deficit disorder, not a mental illness," and that Garcia had "not provided any evidence that he suffered from bipolar disorder, a mental disorder, or anything else that would entitle him to a new trial." The State referenced the BCX done in relation to this case wherein Garcia was found to be legally sane at the time of the offense, with the psychologist determining that "Garcia was not manifesting symptoms of a mental disease or defect which would have caused him to lack substantial capacity to appreciate the criminality of his conduct." The psychologist rendered this decision after reviewing Garcia's medical records from Cermak Hospital (the hospital at the jail where he was detained), wherein Garcia denied any symptoms of psychosis or mania and where the Cermak psychiatrist believed Garcia was exaggerating symptoms and "manipulating his conditions" in an attempt to help his case.

¶ 42   In reply, defense counsel conceded that his "client did not get medical treatment. Perhaps he should have," and reiterated that the PSI states that Garcia self-reports that "he's bipolar and schizophrenic." Counsel again argued that Garcia's mental illness could explain some of his memory loss issues at trial, like not remembering his good friend's name who had passed away. The court denied Garcia's motion for new trial, and the parties proceeded to sentencing.

¶ 43   The PSI reflected that Garcia had been adjudicated delinquent in 2002 for unlawful possession of a weapon (at sentencing, the prosecutor indicated that Garcia was in possession of ammunition), in 2003 for possession of a controlled substance, and in 2004 for possession of a controlled substance. He was convicted of delivery of cannabis in 2014, for which he received conditional discharge and had a pending possession of cannabis case. Contrary to the January 2004 social work treatment summary, the PSI did not indicate that Garcia had ever been

"arrested and charged with attempted murder."

¶ 44    Garcia reported that he was raised by his mother, a school nurse; had a "good" childhood; and was close with his siblings. He graduated from an alternative high school, where he was a "good" student and had received Social Security benefits for 15 years due to a disability. He reported that he joined the Maniac Latin Disciple street gang when he was 10 years old, and he "called the shots [as] a well-known leader," although counsel verbally indicated that Garcia denied he ever made those statements to the investigator. Garcia stated that he had been diagnosed with bipolar disorder and schizophrenia 20 years prior but had not participated in treatment for the past 5 years.

¶ 45    The court sentenced Garcia to 25 years on each count of the four counts for which he was convicted, to run consecutively to each other, for a total of 100 years. Garcia did not file a motion to reconsider the court's sentence. Garcia now appeals.

¶ 46                                    II. ANALYSIS

¶ 47                        A. Denial of Motion for New Trial

¶ 48    Garcia argues that the trial court abused its discretion when it denied his motion for new trial based on newly discovered evidence of his cognitive and social impairments because it "effectively barred him from presenting a complete defense" where these conditions reflected on his credibility, which was a central issue in the case. Alternatively, Garcia asserts he received ineffective assistance of counsel when counsel failed to discover the evidence of his cognitive and social impairments before trial and failed to take full advantage of it posttrial. Finally, Garcia asserts that his sentence of 100 years' imprisonment was excessive under several legal theories.

¶ 49    To warrant a new trial based on newly discovered evidence, the evidence must (1) have been discovered since the trial, (2) must be of such a character that it could not have been

discovered prior to trial with the exercise of due diligence, (3) must be material to the issue and not merely cumulative, and (4) must be of such a conclusive character that it will likely change the result on retrial. *People v. Gabriel*, 398 Ill. App. 3d 332, 350 (2010). "Generally, evidence is not 'newly discovered' when it presents facts already known to the defendant at or prior to trial, though the source of those facts may have been unknown, unavailable, or uncooperative." *People v. Barnslater*, 373 Ill. App. 3d 512, 523-24 (2007). The trial court's denial of a motion for a new trial based on newly discovered evidence will be reversed on appeal if the trial court abused its discretion. *People v. Villareal*, 201 Ill. App. 3d 223, 229 (1990).

¶ 50    The evidence that Garcia claims to be "newly discovered" was known to Garcia prior to trial. The documents he sought to admit were regarding his schooling, assessments he underwent, and diagnoses rendered that affected his schooling and upbringing and resulted in an award of Social Security benefits after hearings at which he testified. Moreover, the record establishes that Garcia informed his attorneys of possible mental health issues and that he received Social Security disability benefits. This information prompted Garcia's attorneys to request a BCX prior to trial. Prior to jury selection, counsel stated that Garcia was bipolar and had been receiving Social Security benefit payments. Then again, during the hearing on Garcia's posttrial motion, counsel conceded that Garcia told him he was receiving social security disability benefits prior to trial, and that he was also aware of the BCX conducted on Garcia earlier in the proceedings and Garcia's claim that he had "a bipolar or schizophrenia condition."

¶ 51    Here, the record clearly establishes that Garcia's counsel was acutely aware that Garcia had reported suffering from mental health issues in the past and that Garcia had been receiving Social Security disability payments. Any supporting documents cannot be considered newly discovered even if Garcia did not know where they were stored. Garcia's alleged inability to

locate the box where they were stored does not make the information contained therein "unknown [or] unavailable." *Barnslater*, 373 Ill. App. 3d at 523. Moreover, Garcia's vague assertion that his relatives came across the documents while going through some boxes, without more, does nothing to support his position that the documents were unknown or unavailable. As such, Garcia has wholly failed to meet his burden to establish that the documents were not known to him or could not have been discovered through due diligence, and the trial court properly denied his motion for new trial on this basis.

¶ 52    Furthermore, this documentation is not of such conclusive character that it would likely change the result on retrial. It was known to Garcia's counsel and to the court prior to trial that Garcia claimed to suffer from mental health issues and that he was receiving Social Security payments, which precipitated the BCX exam in this case. Garcia had a mental health evaluation during his BCX, which occurred prior to trial between 2014 and 2015. While the documents that Garcia sought to admit for consideration tended to show that he had suffered from mental illness in the past, that information was already known. None of the information contained therein had any direct effect on the physical evidence that established Garcia's guilt in this case, especially where Garcia was found to be legally sane at the time of the offense. We cannot say that these documents would change the result on retrial.

¶ 53                    B. Ineffective Assistance of Counsel

¶ 54    Alternatively, Garcia argues that his counsel was ineffective when he failed to discover the evidence before trial and take full advantage of it posttrial. Garcia argues that evidence of his "borderline intellectual functioning and other cognitive/social impairments was material and not cumulative" because his entire defense at trial consisted of his testimony, so his credibility became the crucial issue in the trial. Garcia blames the inconsistencies in his testimony on his

low IQ and his social impairments and asserts that "the new evidence would have countered these impressions and strengthened [his] credibility."

¶ 55    We analyze a claim of ineffective assistance of counsel under the *Strickland* standard. See *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that (1) counsel's representation fell below an objective standard of reasonableness and (2) counsel's substandard representation so prejudiced the defense as to deny defendant a fair trial. *Id.* at 687-88. To demonstrate prejudice, a defendant must show there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. If defendant's claim can be disposed of on the basis that defendant did not suffer sufficient prejudice, the court does not need to determine whether counsel's performance amounted to less than reasonably effective assistance. *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991).

¶ 56    The decision regarding what evidence to present is a strategic one. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. However, "[a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002). To this end, counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Garcia suffered no prejudice because of counsel's failure to discover the evidence prior to trial and take full advantage of it posttrial because the evidence of Garcia's guilt was overwhelming. In addition, as stated earlier, Garcia and his family were aware that these documents existed prior to trial. Moreover, Garcia's argument that the subject documents would have affected the jury's perception of his credibility is purely speculative, particularly when Garcia had been given a BCX weeks before trial and was found to be legally sane at the time of

the offense. Furthermore, evidence of a defendant's mental health is admissible at trial in Illinois for the very limited purpose of explaining a defendant's mental state at the time of an offense if the affirmative defense of insanity is filed pursuant to section 6-2 of the Criminal Code of 2012 (720 ILCS 5/6-2 (West 2018)). Garcia did not present an insanity defense in this case. Moreover, counsel attempted to have the evidence admitted posttrial. The trial court did not allow the evidence to be admitted. We cannot say that Garcia suffered prejudice from counsel's alleged failures.

¶ 57                          C. Sentencing Issues

¶ 58    We turn now to Garcia's sentence. Garcia contends that because he has an intellectual disability, his 100-year sentence violates the eighth amendment of the United States Constitution and the Illinois Constitution's proportionate penalties clause. He also argues that his sentence is excessive on three separate grounds. First, he contends that he was penalized for exercising his constitutional right to trial where the circuit court, despite having recommended a term of 36 years at a plea bargain conference, sentenced him to 100 years' imprisonment after he was convicted. Second, he contends that the circuit court abused its discretion by failing to consider his undisputed intellectual disability. Third, he contends that the circuit court abused its discretion by failing to account for his prospect of rehabilitation. We reject Garcia's claim that his sentence violates the eighth amendment of the United States Constitution and proportionate penalties clause of the Illinois Constitution but agree that his sentence is excessive for each of the three separate reasons he advances. Therefore, for the reasons that follow, we vacate Garcia's sentence and remand for a new sentencing hearing.

¶ 59    In ordering a new sentencing hearing, we do not seek to deprecate the heinousness of Garcia's offenses. Nor do we intend to downplay the trauma that C.P. was subjected to, the pain

18

that she still faces, and the harm that she will continue to face because of Garcia's actions. We have read C.P.'s victim impact statement and the testimony that C.P. gave at the sentencing hearing. As C.P. aptly put it, what Garcia did to her was "wrong[,] heinous [, and] malicious on every level." Garcia deserves a substantial sentence for his offenses, which the circuit court will determine on remand subject to our decision and reasoning herein.

¶ 60    Before reaching the merits of Garcia's sentencing error claims, we must address the State's argument that Garcia forfeited the challenges to his sentence by failing to raise the sentencing issues in his posttrial motion. Garcia acknowledges the forfeiture in his reply brief but urges us to consider his sentencing claims as plain error.

¶ 61    To preserve a claim of sentencing error, the defendant must make a contemporaneous objection and raise the issue in a postsentencing motion. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). The plain error doctrine permits a reviewing court to consider unpreserved error when (1) the evidence is close, regardless of the seriousness of the error or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). In the context of a sentencing hearing, a defendant must show that an error occurred and either (1) the evidence at the hearing was closely balanced or (2) the error was so egregious that it denied the defendant a fair hearing. *Hillier*, 237 Ill. 2d at 545. The first step in plain error review is to determine whether an error occurred. See *People v. Hood*, 2016 IL 118581, ¶ 18 (without error, there can be no plain error). A defendant has the burden to establish plain error. See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 62                    1. Eighth Amendment and Proportionate Penalties Claim

¶ 63    With respect to his first claim of sentencing error, relying on *People v. Coty*, 2018 IL App (1st) 162383, Garcia claims that due to his intellectual disability, his sentence violates the

eighth amendment of the United States Constitution and the Illinois Constitution's proportionate penalties clause. In *Coty*, we held that an intellectually disabled defendant's discretionary life term violated the proportionate penalties clause. *Id.* ¶ 86. In so holding, we extended the protections announced in *Miller v. Alabama*, 567 U.S. 460 (2012), to intellectually disabled adults and looked to the "evolving standard[s] of decency" that led the law to bar *de jure* and *de facto* mandatory or discretionary life terms for minors "where procedurally the court fails to consider the attendant characteristics of youth." *Coty*, 2018 IL App (1st) 162383, ¶¶ 61-68 (summarizing eighth amendment and proportionate penalties cases).

¶ 64    To the extent that Garcia relies on his intellectual disabilities to support his claim of sentencing error, our supreme court foreclosed this argument in *People v. Coty*, 2020 IL 123972, overruling this court's decision in *Coty*, 2018 IL App (1st) 162383. Our supreme court held that "the *Miller* Court's decision is founded, principally, upon the transient characteristics of youth, characteristics not shared by adults who are intellectually disabled" (emphasis omitted) (*Coty*, 2020 IL 123972, ¶ 39), and observed, "unlike a juvenile, whose mental development and maturation will eventually increase that [rehabilitative] potential, the same cannot generally be said of the intellectually disabled over time" (*id.* ¶ 37). "The rehabilitative prospects of youth do not figure into the sentencing calculus" for an intellectually disabled adult defendant. *Id.* ¶ 40. The court concluded that the intellectually disabled defendant's initial mandatory natural life sentence was not unconstitutional as applied to him. *Id.* ¶ 42. As the *Coty* court observed, "[c]ourts across the country that have addressed the issue *** have declined to extend *Atkins* [*v. Virginia*, 536 U.S. 304 (2002),] to noncapital sentences or *Miller* to the intellectually disabled." (Internal quotation marks omitted.) *Id.* ¶ 45. In accordance with our supreme court's decision in

*Coty*, Garcia's sentence is not unconstitutional because he is intellectually disabled. Therefore, no error occurred here, and plain error analysis is not necessary.

¶ 65                              2. Excessive Sentence—Trial Penalty

¶ 66    Garcia next contends that he was penalized for exercising his constitutional right to trial where the circuit court, despite having recommended a term of 36 years at a plea bargain conference, sentenced him to 100 years' imprisonment after he was convicted. Garcia claims this sentence amounts to error. We agree.

¶ 67    A trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive. *People v. Jones*, 168 Ill. 2d 367, 373 (1995). A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case and depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). "In determining an appropriate sentence, the defendant's history, character, rehabilitative potential, the seriousness of the offense, the need to protect society and the need for deterrence and punishment must be equally weighed." *People v. Jones*, 295 Ill. App. 3d 444, 455 (1998). The potential for rehabilitation need not be given any greater weight than the seriousness of the offense. *People v. Sharpe*, 216 Ill. 2d 481, 525 (2005). There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and the court is presumed to have considered any evidence in mitigation that is before it. *People v. Partin*, 156 Ill. App. 3d 365, 373 (1987). The imposition of a sentence is a matter within the trial court's discretion, and a reviewing court has the power to disturb the sentence only if the trial court abused its discretion. *Jones*, 168 Ill. 2d at 373-74.

¶ 68    Garcia was convicted of three counts of aggravated criminal sexual assault and one count of aggravated kidnapping, all Class X felonies. Each of the four counts is punishable by a sentencing term of 6 to 30 years (720 ILCS 5/11-1.30, 10-2 (West 2018)), and the sentences imposed on each count are required to run consecutively (730 ILCS 5/5-8-4(d) (West 2018)). The PSI reflected that Garcia had been adjudicated delinquent in 2002 for unlawful possession of a weapon (ammunition according to the State); in 2003 for possession of a controlled substance; and in 2004 for possession of a controlled substance. As an adult, he was convicted of delivery of cannabis in 2014, for which he received conditional discharge, and had a pending possession of cannabis case. At sentencing, the State sought a *de facto* life term: "[Garcia] should be given a sentence that forces him to remain in prison the rest of his life and to ensure that he will never walk our city streets again."

¶ 69    The circuit court found that Garcia's crimes were "horrendous," "bel[ie] humanity," and stripped the victim of her "dignity and humanity." The court further found that Garcia's testimony was "absurd," a "work of fiction," and belied "all believability and strains the limits of credibility." The court also stated that Garcia had engaged in "horrendous conduct and complete disrespect for another human being's life, a person you never knew until you forced yourself on her." In addition, the circuit court stated that C.P. was a "hero" in that she saved her life "because of the way she conducted herself during this horrific episode of her life just because she wanted to get home to her son." These findings are well supported by the evidence.

¶ 70    Garcia must serve at least 85% of his 100-year sentence. 730 ILCS 5/5-8-4(g)(4), 3-6-3(a)(2)(ii) (West 2018). After credit for time served, the earliest Garcia will be released is when he is 112 years old, effectively making his sentence a *de facto* life term, just as the State requested. Of course, Garcia's 100-year sentence falls within the applicable aggregate sentencing

22

range of 24 to 120 years, and we acknowledge this sentence is generally presumptively proper. Nevertheless, even a sentence within the range prescribed by the legislature can amount to an abuse of discretion if it is "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 71 At the outset, we address the State's overarching argument that the *de facto* life sentence rubric is not applicable to Garcia because he is an adult. Garcia's point, however, is more elementary—he will spend the rest of his life in prison. Recently, in *People v. Wilson*, 2022 IL App (1st) 192048, ¶¶ 84, 95, 102, this court remanded for an evidentiary hearing on the defendant's claim that his 65-year sentence, imposed for a crime committed when he was 19 years old, was a *de facto* life sentence and violated the proportionate penalties clause of the Illinois Constitution. In so doing, this court noted that in *People v. Buffer*, 2019 IL 122327, ¶ 41, our supreme court identified a sentence over 40 years as a *de facto* life sentence for a juvenile. *Wilson*, 2022 IL App (1st) 192048, ¶ 95. As here, the State argued that *Buffer* " 'was only focused on juveniles,' " so a sentence of over 40 years for an older defendant was not necessarily a *de facto* life sentence for older defendants. *Id.* But this court rejected that argument: "[W]e fail to see why that line would be drawn at anything *beyond* the 40 years established in *Buffer*." (Emphasis in original.) *Id.* After all, an older defendant "will reach his anticipated life expectancy sooner, not later, than a juvenile offender." *Id.* Likewise, because Garcia will not be eligible for parole until 2099, when he would be 112 years old, Garcia is serving the "functional equivalent" of natural life. See *People v. Morris*, 2017 IL App (1st) 141117, ¶ 30 (aggregate 100-year term was a *de facto* life sentence where defendant would not be eligible for parole until he was 109). To be clear, we make this point only to confirm the obvious—Garcia's 100-year sentence means that he will spend the rest of his life in prison.

¶ 72    Garcia asserts that he was penalized for exercising his constitutional right to trial instead of accepting the 40-year term offered by the State or 36-year term recommended by the circuit court at the Illinois Supreme Court Rule 402 (eff. July 1, 2012) plea bargain conference. He couches this argument as both a constitutional claim and as an abuse of discretion. For support, he points to the large plea-trial sentencing disparity. The State responds that a plea-trial sentencing disparity, standing alone, does not taint a sentence because it is well established that a trial court has discretion to impose a longer sentence after trial than what it would have imposed in exchange for a guilty plea. See *People v. Morgan*, 59 Ill. 2d 276, 281 (1974) (disparity "does not, standing alone, taint the sentence"). In addition, the State argues that other than the plea-trial sentencing disparity, Garcia cannot point to any explicit evidence that the circuit court punished him for exercising his right to trial. In reply, Garcia points to numerous examples of what he claims is the circuit court expressing its frustrations with, and animosity towards, his trial counsel, Frank Avila.

¶ 73    The United States and Illinois Constitutions grant an accused the right to be tried. U.S. Const., amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ***."); Ill. Const. 1970, art. I, § 8 ("In criminal prosecutions, the accused shall have the right *** to have a speedy public trial by an impartial jury ***."). "Although it may be proper in imposing sentence to grant concessions to a defendant who enters a plea of guilty, a court may not penalize a defendant for asserting his right to a trial either by the court or by a jury." *People v. Ward*, 113 Ill. 2d 516, 526 (1986). In other words, while a mere disparity between the sentence offered during plea bargaining and that ultimately imposed, of itself, does not warrant a reviewing court using its power to reduce a term of imprisonment, it is unconstitutional for a trial judge to punish a defendant merely for exercising

his right to a jury trial. *People v. Dennis*, 28 Ill. App. 3d 74, 77-78 (1975). Besides overt comments of the trial court to the effect that the sentence imposed was punishment for a defendant's trial demand, we have also recognized that a constitutional deprivation of this nature may be shown inferentially. *Id.* at 78. "[A] 'reasonable inference' of a constitutional deprivation may be drawn where a great disparity exists between the sentence offered at a pretrial conference to which the trial judge was a participant and one imposed at the conclusion of a jury trial." *Id.* In *Dennis*, the court found error where the sentence offered in exchange for a guilty plea was 2 to 6 years, but the sentence imposed after trial was 40 to 80 years. *Id.*

¶ 74 Here, the sentencing judge presided over the plea bargain conference. As is common practice, however, there is no record of the Rule 402 conference, and we do not know the precise details of what was shared with the circuit court. Nevertheless, the State does not dispute that, at the Rule 402 conference, the circuit court was advised of the essential facts that the State intended to establish at trial. As the State recounts in its brief, "[w]hat [the record] does show is that by choosing to go to trial, [Garcia] permitted the court to hear significant details of [Garcia's] egregious behavior and to observe the damage it inflicted upon [the victim] firsthand, *rather than just hearing it in a conference room from the prosecutor*." (Emphasis added.) Moreover, the record shows that the circuit court was also advised of the essential facts at a hearing on Garcia's motion to reconsider bond. There, the State recounted that Garcia entered the victim's car at a gas station, told her that he was armed and worked for the cartel, and said that he was sent to kill her date. The State explained that Garcia punched the screaming victim as he drove her to an unfamiliar location, where he then ripped off the victim's shorts, raped her vaginally without a condom, forced her to perform oral sex on him, and vaginally raped her again while inserting his fingers in her anus, all the while saying vulgar and vile things to her.

The State further described Garcia strangling and striking the victim throughout the attack and the victim's continued crying. The State then told the court that Garcia drove the victim to her south suburban bank, where he forced her to withdraw money and give it to him, and that he then dropped the victim off at her home, placing his cell phone number in her phone and leaving with her car. The State advised the court that a rape kit yielded semen samples that were forensically analyzed and matched to Garcia's DNA profile. The court was also told that Garcia was arrested while in possession of a cell phone that had been stolen from a robbery victim an hour before the kidnapping and sexual assault of the victim here. The State provided the court with Garcia's juvenile and adult criminal history and did so again during a subsequent hearing on Garcia's motion to reconsider bond the following month.

¶ 75    It was after all of these hearings had occurred that the parties agreed to a plea conference with the judge. During the conference, the State offered Garcia a term of 40 years in exchange for his plea of guilty. The circuit court recommended a term of 36 years, or 9 years for each of the four counts, which we understand are the same four counts that were tried. The circuit court explained to Garcia that he could receive a prison term of up to 120 years if he was convicted on all four counts. Garcia rejected the plea bargain offer in favor of trial.

¶ 76    A sentencing court should give proper consideration for a prior plea offer when determining punishment after trial. See *People v. Scott*, 256 Ill. App. 3d 844, 855 (1993) ("[T]he trial judge offered a sentence of 10 years if defendant would plead guilty. There is no explanation as to why the sentence was tripled when defendant was found guilty after choosing to go to trial. While it is not proper for the reviewing court to substitute its own judgment for that of the trial court absent an abuse of discretion [citation], such an abuse would be found if it were to be shown that the enhanced sentence was in retaliation for rejecting a plea offer.

Consequently, if the new trial results in a guilty verdict, the sentencing judge should give proper consideration to the previous sentencing offer, even if he is a different judge who did not participate in the prior plea offer."). In order to preserve public confidence in the judicial process, a number of states have adopted American Bar Association (ABA) Standard No. 14-1.8(b), which states that a defendant should not be punished for exercising his constitutional right to trial. Standards for Criminal Justice No. 14-1.8(b) (Am. Bar Ass'n 3d ed. 1999). Under this approach, to allow for judicial review of a sentence when the sentencing court was involved in the plea-bargaining process and imposes a harsher sentence after trial than was offered in exchange for a guilty plea, the sentencing court must specifically point out the factors that justify the increased sentence. See *e.g.*, *State v. Baldwin*, 629 P.2d 222, 224-26 (Mont. 1981) (adopting ABA Standards for Criminal Justice No. 14-1.8(b) (Am. Bar Ass'n 2d ed. 1980) and remanding case because "[w]e have no assurance that the trial court did not increase the sentence in retaliation for defendant's insistence on a trial by jury"); see also *Wilson v. State*, 845 So. 2d 142, 157 (Fla. 2003) ("[A] judge who, having been advised of the details of the case and having been actively involved in an unsuccessful plea bargaining discussion, wishes to impose a post-trial sentence more severe than that contemplated by his or her plea negotiations, would be wise to explain his or her reasons for the greater sentence in order to dispel any appearance of vindictive sentencing." (Internal quotation marks omitted.)); *State v. Moore*, 547 N.W.2d 159, 171 (Neb. Ct. App. 1996) ("[W]hen a judge advises the defendant of the penalty that would be imposed upon a plea of guilty and then imposes a significantly harsher sentence when the defendant is found guilty after a trial, the judge then bears the burden of establishing that the increased sentence is due solely to the facts of the case and the personal history of the defendant. If the trial court, which was involved in the plea bargaining or created the appearance thereof, fails to

establish the reason for the harsher sentence, the failure to so establish renders the harsher sentence an abuse of discretion.").

¶ 77    Garcia's 100-year term of imprisonment is six decades longer than what the State offered, and 64 years more than what the circuit judge recommended. We find that the only reasonable explanation for this exceptionally large plea-trial sentencing disparity is that Garcia was penalized for exercising his right to trial. The plea-trial disparity in this case—whether measured by years or percentage—is exceptionally large, 64 years or 177%, respectively. A recent survey and review of numerous empirical studies in the last few decades on plea-trial sentencing disparities found an increase of 15-60% in average sentence length. Brian D. Johnson, *Trials and Tribulations: The Trial Tax and the Process of Punishment*, 48 Crime & Just. 313, 314-15 (2019) ("[T]here are persuasive reasons to believe the trial tax is real and substantial. Quantitative studies consistently unearth large plea-trial disparities, qualitative research confirms their existence, and attempts to address sample selection issues do not explain it. Most likely, common methodological problems result in systematic underestimation of the size of the trial tax."). We acknowledge that some criminal law scholars account for the plea-trial sentencing disparity entirely as the incentive or discount to plead guilty, but the dominant view is that plea-trial sentencing disparities represent a trial penalty, and even scholars in the incentive camp recognize the need to assume penalties away. See Ben Grunwald, *Distinguishing Plea Discounts and Trial Penalties*, 37 Ga. St. U. L. Rev. 261, 264-65 (2021) (compiling law review articles and cases and proposing framework for empirical test to distinguish between plea incentive and trial penalty). Here, the 177% plea-trial sentencing disparity exceeds the 15-60% average plea-trial sentencing disparity reported by Professor Johnson in his review of the empirical studies by a factor of between 2.95 and 11.8. See Johnson, *supra*, at 314.

¶ 78    We cannot account for the large plea-trial sentencing disparity here by any change in the State's theory at trial. We understand the State pursued the same four counts at trial that it presented at the Rule 402 conference. The circuit court recommended nine years on each of the four counts at the Rule 402 conference, but then sentenced Garcia to 25 years on each of these four counts. Likewise, we have not been made aware of any additional salient facts that came out at trial regarding Garcia's offenses that were not provided to the circuit court at the Rule 402 conference.

¶ 79    Nor can we account for the extraordinary plea-trial sentencing disparity here solely as an incentive or discount to plead guilty. Garcia contends that the disparity reflects, in substantial part, a penalty or tax for exercising his constitutional right to be tried. The plea discount notion may have been acceptable when trials were the norm, but not when, as now, the overwhelming majority of criminal defendants plead guilty and pleas have become the normative baseline. *Id.* at 322. Borrowing an analogy to purchasing a new car (which we readily acknowledge may no longer be the best after the new car market was upended by the COVID-19 pandemic), "only an ignorant, ill-advised consumer would view the full [sticker] price as the norm and anything less as a bargain." Stephanos Bibas, *Regulating the Plea-Bargaining Market: From Caveat Emptor to Consumer Protection*, 99 Calif. L. Rev. 1117, 1138 (2011). To be sure, trial defendants often receive " 'longer sentences than even Congress or the prosecutor might think appropriate, because the longer sentences exist on the books largely for bargaining purposes.' " *Missouri v. Frye*, 566 U.S. 134, 144 (2012) (quoting Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 1034 (2006)).

¶ 80    We do not doubt that the circuit court, in recommending a term of 36 years, factored in an incentive for Garcia to plead guilty. But we must also recognize that the circuit court's

recommendation reflected the nature and gravity of the offense and the harm that it caused the victim. Otherwise, the victim's voice in the plea bargain process would have been muted, and the public would quickly lose faith in our criminal justice system. Here, after the experienced trial judge was provided with a detailed factual predicate describing the heinous series of criminal acts that were certain to have caused substantial harm and ongoing trauma to the victim, he recommended a term of 36 years' imprisonment. Yet, when the same facts were proven at trial, the circuit judge sentenced Garcia to 100 years' imprisonment, almost three times longer than what he recommended at the plea bargain conference. We are unable to account for this wide plea-trial sentencing discrepancy exclusively as the incentive for Garcia to plead guilty.

¶ 81     We recognize that the disparity is not the 20 times multiple to which the defendant in *Dennis* was sentenced and that other courts have rejected trial penalty arguments because the trial sentence was less than the 20 times multiple in *Dennis*. However, *Dennis* was based on its unique facts and circumstances (see *Dennis*, 28 Ill. App. 3d at 78 (limiting finding of constitutional deprivation to "facts of the instant case")) and did not establish a factor of 20 as the minimum necessary to infer a trial penalty. Indeed, at argument, the State acknowledged that whether a defendant was subject to a trial tax must be assessed on the facts and circumstances of each case. Here, had Garcia accepted the circuit court's plea recommendation, and assuming good behavior, he would have been released in his upper fifties. The trial sentence, on the other hand, means that Garcia will spend the rest of his natural life in prison. We are unable to discern even the slightest degree of semblance between the plea recommendation and sentence after trial. Although the circuit court did not have the benefit of the color that comes with the victim's testimony and victim impact statement, it did have before it the cold, hard facts that the State intended to prove. We have no doubt that the experienced circuit judge fully comprehended the

gravity of Garcia's offenses and nature of his defense when the facts were explained to him at plea bargaining and he recommended a term of 36 years.

¶ 82    Recently, in *People v. Walker*, 2021 IL App (4th) 190073, ¶¶ 68-69, a child sexual assault case that was decided after briefing in this case was completed, the court held that the defendant was not penalized for exercising his right to trial where he was sentenced to an aggregate term of 35 years after rejecting the State's offer of a "plea to a Class 2 felony and probation" where the trial court was not involved in the plea-bargaining stage. In so holding, the court expressed skepticism of *Dennis*, finding its reasoning "shaky at best" and, in any case, noting repeatedly that a trial penalty may not be inferred where a different judge was involved in the plea-bargaining conference. *Id.* ¶¶ 65-66, 68, 71 ("Where the trial court is not involved in the plea-bargaining process, we emphatically reject the notion that a permissible inference arises that a 'trial tax' was imposed instead of the exercise of a trial court's independent discretion at sentencing."). But see *People v. Peddicord*, 85 Ill. App. 3d 414, 421 (1980) ("The fact that the judge presiding at the pretrial conference was not the same judge who sentenced the defendant after his conviction is not indicative, as the State would have us believe, of an independent determination of an appropriate sentence. The trial judge who presided at the trial and sentencing hearing must be held responsible for an awareness of the previous history of the case."); *Scott*, 256 Ill. App. 3d at 855 (a sentencing court should give proper consideration for a prior plea offer when determining punishment after trial, "even if he is a different judge who did not participate in the prior plea offer").

¶ 83    *Walker* rhetorically questioned how we got to the point where a reviewing court could reverse a trial court's sentence as retributive, based merely on a large disparity in the plea-trial sentence. The answer is no doubt complicated but the short answer is that our criminal justice

31

system has evolved from one of trials to one of plea bargains. See *Lafler v. Cooper*, 566 U.S. 156, 170 (2012) ("criminal justice today is for the most part a system of pleas, not a system of trials"); *Frye*, 566 U.S. at 144 (plea bargaining "is not some adjunct to the criminal justice system; it *is* the criminal justice system" (emphasis in original and internal quotation marks omitted)). It is estimated that 95% of criminal cases that are not dismissed are disposed of by plea bargain. *Frye*, 566 U.S. at 143. Plea bargaining today is more collaborative (and some argue collusive), as opposed to adversarial, where each of the relevant actors—prosecutor, trial court, and defender organizations—are incentivized to resolve cases quickly and consensually due to enormous caseloads and lack of sufficient resources to try even a small incremental fraction of additional cases. See Stephanos Bibas, *Incompetent Plea Bargaining and Extrajudicial Reforms*, 126 Harv. L. Rev. 150, 164-65 (2012). And the legislature, which is directly accountable to the public, benefits because plea bargaining ensures public safety by imprisoning criminals. *Id.* at 165. Given the enormous pressures to dispose of cases, it would be naïve for us not to recognize that there may be instances of defendants being penalized for exercising their constitutional right to be tried where they impose additional burdens on an already overworked criminal justice system.

¶ 84    Moreover, we do not share *Walker*'s view that *Dennis* was incorrectly decided. *Dennis* was very clearly decided on the unique facts of the case. To hold that a trial judge's admission on the record that he penalized a defendant at sentencing for exercising his right to trial is the *sine qua non* of a constitutional deprivation, ignores the reality of our plea-bargained dominated criminal justice system, and turns a blind eye to the numerous and consistent studies that support the existence of a trial tax. In addition to the numerous empirical studies, data reported by the United States Sentencing Commission in 2010 suggests that the severity of the trial penalty has

increased as trial rates have declined in the wake of recent federal criminal justice policy changes. See Johnson, *supra*, at 334-35. To illustrate, the trial penalty increased from 24% in the post-PROTECT Act [(Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, § 1(a), 117 Stat. 650 (2003))] period (2003), to 36% in the post-*Booker* [(*United States v. Booker*, 543 U.S. 220 (2005))] period (2005), to 51% in the post-*Gall* [(*Gall v. United States*, 552 U.S. 38 (2007))] period (2007). *Id.* (citing U.S. Sentencing Comm'n, Demographic Differences in Federal Sentencing Practices: An Update of the Booker Report's Multivariate Regression Analysis (Mar. 2010), https://www.ussc.gov/sites/ default/files/pdf/research-and-publications/research-publications/2010/20100311_Multivariate_ Regression_Analysis_Report.pdf [https://perma.cc/V925-HZBX]; Jeffery T. Ulmer, Michael T. Light, & John H. Kramer, *Racial Disparity in the Wake of the Booker/Fanfan Decision: An Alternate Analysis to the USSC's 2010 Report*, 10 Criminology & Pub. Policy 1077-1118 (2011)). In the almost 50 years since *Dennis* was decided, guilty pleas rates have grown dramatically, while plea-trial sentencing disparities have only worsened. See *id.* at 314.

¶ 85     Finally, we find it significant that, for Garcia, the plea-trial sentencing disparity represents the difference between possible release from prison in his late fifties and definitely spending the rest of his life in prison. When determining whether a defendant has been subject to a trial penalty, a *de facto* life sentence, as here, should merit more exacting scrutiny. After all, most defendants convicted of murder do not spend the rest of their life in prison[1] (Danielle Kaeble, U.S. Dep't of Justice, Time Served in State Prison, 2018 1-4 (Mar. 2021), https:// bjs.ojp.gov/content/pub/pdf/tssp18.pdf [https://perma.cc/U7BQ-ETR5] (average sentence length

---

[1]Without aggravating circumstances or add-ons for the use of a firearm, the sentence for first degree murder in Illinois is 20 to 60 years. 720 ILCS 5/9-1 (West 2018); 730 ILCS 5-5-4.5-20 (West 2018).

for murder equals 48.8 years and median time served in prison for murder equals 17.5 years));

most defendants "age out" of crime (internal quotation marks omitted) (*People v. Lusby*, 2020 IL 124046, ¶ 141 (Neville, J., dissenting upon denial of rehearing)). As we explain below, our constitution requires that we impose a sentence with the objective of rehabilitation when possible, particularly for defendants like Garcia who are younger in age. We therefore find that error occurred.

¶ 86    Our determination that the circuit court imposed a trial tax finds further support in the numerous examples of the circuit court's frustration with Garcia's counsel, Frank Avila. Garcia contends, and we agree, that the animosity between the circuit court and Avila contributed to the higher sentence Garcia received after exercising his right to trial. For example, the circuit court told Avila that he was boring the jury by repeatedly asking questions that were already answered and otherwise asking poorly formulated or irrelevant questions. Avila responded that he would continue asking questions his way, noting that he had won 10 of his last 11 jury trials. Another example is when Avila, at the close of the State's case-in-chief, moved to dismiss the case for lack of jurisdiction. After denying the motion, the circuit court asked Avila if he had any other motions, to which Avila responded in the negative. The circuit court followed up with, "How about a motion for directed finding at the State's close of the evidence, that they have not met their burden," "do you want to make that one *** which is a motion made in the normal course of a criminal trial." Avila answered in the negative, to which the circuit judge replied, "perfect." Garcia offers numerous other examples to illustrate his contention that the circuit court was frustrated with Avila's representation during both pretrial, trial, and posttrial proceedings. We acknowledge that there are often moments in the heat of trial where counsel and the court will be at odds and frustrations are expressed in each direction. In this case, however, we find it entirely

probable, based on the disparity between the sentence offered in exchange for a plea of guilty and the sentence Garcia received, that the discord between the court and Avila played a part in the sentence Garcia received after trial.

¶ 87    To be clear, we do not hold that any sentence that a defendant may receive that is greater or even significantly greater than the offer at the Rule 402 conference constitutes a trial penalty. A court may impose a sentence following conviction that is greater than what was offered a defendant at a plea-bargaining conference. See *Morgan*, 59 Ill. 2d at 281. Our holding today is that, under the particular circumstances of this case, the record supports Garcia's claim that he was penalized for exercising his right to trial when he was given a 100-year sentence after the circuit court recommended a term of 36 years at the plea bargain conference.

¶ 88                    2. Excessive Sentence—Intellectual Disability

¶ 89    We also find the circuit court abused its discretion by failing to adequately consider Garcia's intellectual disability. In his motion for new trial, Garcia presented records establishing his intellectual disability, including the SSR decision dated February 22, 2006, when Garcia was 19 years old; a treatment summary record dated January 2004 when Garcia was in eleventh grade; and a report of psychological evaluation when Garcia was in tenth grade. The hearing officer's decision reflected that she considered Garcia's school, psychological, treatment, and other records and heard testimony from Garcia and his mother. The records showed that Garcia was receiving 25 hours of special education services per week, including 40 minutes per week of social work services for emotional behavior problems, at Day Alternative School. Garcia required a structured program with a low student to teacher ratio, often fed into negative behavior, exhibited attention-seeking behavior, and often got frustrated by his low academic achievement and inability to express himself. Garcia also had an infant daughter at the time. The

hearing officer found that Garcia was originally granted Supplemental Security Disabled Child benefits at age 13 due to la earning disability and speech and language delays (at the time Garcia was reading at the first-grade level). Garcia's case was reviewed again when he turned 18 to determine whether he qualified for benefits under the adult criteria for disability, but his benefits were terminated because he failed to provide the necessary evidence to process his claim. Garcia challenged the decision, which led to the hearing.

¶ 90 The hearing officer found that, per a psychological evaluation report dated November 2005, Garcia has a full-scale intelligence quotient (IQ) score of 70, "placing him in the lower half of the borderline range of intellectual functioning." To put that in perspective, "[i]t is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins. v. Virginia*, 536 U.S. 304, 309 n.5 (2002) (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (Benjamin Sadock & Virginia Sadock eds., 7th ed. 2000)); *Hall v. Florida*, 572 U.S. 701, 719 (2014) ("[m]ild mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70," and an IQ of 70 to 75 is "typically considered the cutoff IQ score" for intellectual disability (internal quotation marks omitted)). Garcia's school records showed that he was diagnosed with emotional behavior disorder and "severe learning disability" that "affected his functioning." A therapist found that Garcia's affect was inappropriate for his emotions. The hearing officer noted that Garcia was behaved at the hearing, testified very well on his behalf, and did not have any problem comprehending the questions put to him. The hearing officer nevertheless concluded that Garcia had "severe impairments with marked limitations in his cognitive skills"; that he did "not retain the mental capacity to understand, remember and carry out the basic demands of simple,

unskilled work activities on a sustained basis day in and day out"; and that he had "marked limitations in his ability to interact appropriately with the co-workers and the general public." Garcia's Social Security disability benefits were reinstated.

¶ 91 The State, for its part, did not dispute that Garcia suffered from an intellectual disability. The circuit court's only comment at sentencing in this regard was, "I will note for the record during the evidence of the defense motion for new trial about the psychological issues that are here, out of 14 years old there's been no live testimony presented to it other than the reports."

¶ 92 An intellectual disability is a mitigating factor at sentencing. 730 ILCS 5/5-5-3.1(a)(13) (West 2018). An intellectual disability is defined as a "sub-average general intellectual functioning generally originating during the developmental period and associated with impairment in adaptive behavior reflected in delayed maturation or reduced learning ability or inadequate social adjustment." *Id.* § 5-1-13. Intellectually disabled defendants are categorically less culpable for their acts, and their diminished blameworthiness reduces society's interest in retribution. *Atkins*, 536 U.S. at 318-20. That is because intellectually disabled adults have diminished capacity to (1) understand and process information, (2) communicate, (3) abstract from mistakes and learn from experience, (4) engage in logical reasoning, (5) control impulses, and (6) understand the reactions of others. *Id.* at 318.

¶ 93 We agree that the circuit court erred by failing to take account of Garcia's intellectual disability at sentencing. Although there is a strong presumption that a trial court's sentence is predicated on proper legal reasoning, including the consideration of any mitigating factors (*People v. Holmes*, 234 Ill. App. 3d 931, 951 (1992)), here the circuit court's comment that there was no live testimony and that the records were 14 years old tells us that he disregarded Garcia's undisputed and documented intellectual disability because the records were stale. See *Rita v.*

*United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority.").

¶ 94      The circuit court erred in two ways with respect to Garcia's intellectual disability. First, Garcia's PSI report states that the investigator was only able to review verified information contained in Garcia's criminal history because Garcia was "in the custody of the Kankakee County Jail and was unable to sign release of information forms." We fail to comprehend how, in this day and age, the investigator assigned to do Garcia's PSI could not secure Garcia's consent for release of his medical, educational, and other records bearing on his intellectual disability simply because Garcia was detained in another jurisdiction. Considering that the circuit court already had before it records of Garcia's intellectual disability, and one of Garcia's main arguments at sentencing was that his intellectual disability was a mitigating factor, if the circuit court felt more current information was required, then it should have ordered further investigation into Garcia's background before passing a sentence.

¶ 95      Second, and more pertinently, the circuit court misapprehended the nature of an intellectual disability when it stated that the records were 14 years old. As we stated above, unlike juvenile offenders whose mental and intellectual development increases over time, the same is not true for offenders who suffer from an intellectual disability. Our supreme court has held that "the *Miller* Court's decision is founded, principally, upon the transient characteristics of youth, characteristics not shared by adults who are intellectually disabled" (emphasis omitted) (*Coty*, 2020 IL 123972, ¶ 39), and further observed that "unlike a juvenile, whose mental development and maturation will eventually increase that [rehabilitative] potential, the same cannot generally be said of the intellectually disabled over time" (*id.* ¶ 37). See also *Muncy v.*

*Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) ("Mental retardation is not normally a condition that improves as an affected person ages," and IQ is "presumed to remain stable over time"). Even the State agrees with Garcia that his intellectual disability and its attendant characteristics "were not transitory, or something that would go away as he aged." Thus, because it is highly likely that the records that Garcia presented in his motion for new trial were reflective of his intellectual disability at the time of his offenses and during trial, the circuit court erred by disregarding Garcia's evidence of intellectual disability at sentencing.

¶ 96     Although intellectual disability is a statutory factor in mitigation, we recognize that it can be a double-edged sword and is not necessarily grounds for a reduced sentence. Our supreme court has determined that future dangerousness of an intellectually disabled adult is a factor properly considered as an aggravator in sentencing, given an appropriate evidentiary basis:

> " '[A] trial court might conclude, from the evidence, that a defendant's mental retardation rendered him dangerous to the community, and for this reason decided to increase the defendant's prison sentence. If, for example, the evidence established that a defendant had diminished impulse control as a result of his mental deficiency, and if that lowered impulse control rendered him a threat to the community, a trial court might conclude that, because of the defendant's future dangerousness resulting from his lack of control, the defendant should be given a greater prison sentence in the interest of protecting the public. [Citation.] However, where mental retardation indicates future dangerousness, it is not the mental retardation that is being used as the aggravating factor. Rather, it is the future dangerousness that *results* from the mental retardation that is the aggravator. In our view, there is nothing improper in considering the effects of mental retardation in this way, so long as the evidence supports the conclusion that the defendant poses a future

danger.' " (Emphasis in original.) *Coty*, 2020 IL 123972, ¶ 35 (quoting *People v. Heider*, 231 Ill. 2d 1, 20-21 (2008)).

¶ 97    In *Coty*, for example, the defendant, who was 46 years old at the time of the offense, was twice convicted of sexual offenses against children, and the court held that diminished capacities that characterize the intellectually disabled made the defendant a continuing danger to reoffend. *Id.* ¶ 36. Here, on the other hand, Garcia's only prior convictions were for nonviolent offenses, none of which were sexual offenses, and he was 27 years old at the time of the offense.

¶ 98    Likewise, when the circuit court commented at sentencing on Garcia's defense theory of consent and that the victim forced herself on Garcia, it stated that the case against Garcia was not close, that Garcia was evasive and cunning, that Garcia had spun wild fabrications of what occurred, and that Garcia thought he was the "smartest person in the room." We observe that Garcia also told C.P. that he was with the cartel, that he was sent by the cartel to kill her, and that the cartel kidnapped the man she was with and threw him in the trunk of a car. But there is no evidence that any of that was true. Garcia also self-reported to the PSI investigator that he was a well-known leader of the Maniac Latin Disciples gang and "called the shots." Again, aside from Garcia's statement to the investigator, there is no evidence that Garcia was a high-ranking member of a gang. Beside his self-aggrandizing and delusional statements, Garcia also exhibited highly unusual behaviors during his commission of offenses against C.P. For example, after raping C.P. thrice, he stroked her hair, rubbed her shoulders, and told her about his life, his daughter, and his mother who passed away. Then he gave her $40, put his phone number in the victim's cell phone, returned the phone to her, and told the victim he would return in the morning to drive her to work. At the very least, Garcia's statements and behaviors reasonably beg the question whether Garcia's apparent belief that he could dupe the jury was due, at least in part, to

his intellectual disability. See *Atkins*, 536 U.S. at 320-21 ("Mentally retarded defendants *** are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes."). Accordingly, it is at least conceivable that Garcia's intellectual disability may mitigate his sentence, and the court abused its discretion in failing to adequately consider it. We therefore find error occurred.

¶ 99                    3. Excessive Sentence—Potential for Rehabilitation

¶ 100   Garcia next contends that the circuit court abused its discretion by failing to consider his potential for rehabilitation. We agree. In Illinois, all criminal penalties are to "be determined both according to the seriousness of the offense *and* with the objective of restoring the offender to useful citizenship." (Emphasis added.) Ill. Const. 1970, art. I, § 11. Although the potential for rehabilitation need not be given any greater weight than the seriousness of the offense (*Sharpe*, 216 Ill. 2d at 525), the court "may not resign to total retribution one who has a chance of future restoration to useful citizenship." *People v. Gibbs*, 49 Ill. App. 3d 644, 648 (1977). Moreover, younger defendants "have greater rehabilitative potential." *People v. Miller*, 202 Ill. 2d 328, 341-42 (2002). An excessively long prison sentence does not serve the goal of rehabilitation. *People v. Odom*, 8 Ill. App. 3d 227, 228 (1972); *People v. Kosanovich*, 69 Ill. App. 3d 748, 752 (1979).

¶ 101   Here, in imposing a 100-year sentence on Garcia, the circuit court effectively determined that Garcia has no prospect for rehabilitation. But the circuit court said nothing about Garcia's potential for rehabilitation. That omission is particularly significant because Garcia was 27 years old at the time of the offense, and all of his prior convictions were for nonviolent offenses, mostly for possession of narcotics. It may be that, as the State suggests, the circuit court found Garcia irredeemable because Garcia thought he was the smartest person in the courtroom, spun wild tales, and otherwise spoke of himself in self-aggrandizing terms. See *Ward*, 113 Ill. 2d at

528 ("A defendant's truthfulness or mendacity while testifying on his own behalf, almost without exception, has been deemed probative of his attitudes toward society and prospects for rehabilitation and hence relevant to sentencing." (Internal quotation marks omitted.)). But Garcia's intellectual disability could just as well account for the kinds of delusional testimony and unusual behaviors that the circuit court found so damning and worthy of an extended sentence. Because the circuit court did not consider Garcia's intellectual disability, appears to have used behaviors characteristic of intellectual disability against Garcia without sufficiently exploring their implications, and did not otherwise make any findings on Garcia's prospect of rehabilitation, we cannot say whether it sufficiently considered Garcia's prospect for rehabilitation. See *People v. Jackson*, 375 Ill. App. 3d 796, 809 (2007) (Wright, J., concurring in part and dissenting in part) ("[T]his state's constitution requires the balancing of retribution and rehabilitation. This is not something we should presume on review or base on clairvoyance. We should require proper judicial balancing that is apparent from the record."). The sentencing court abused its discretion and error occurred here.

¶ 102   As we have found that error occurred with respect to all three of defendant's arguments relating to the excessiveness his sentence, we must now determine whether (1) the evidence at the hearing was closely balanced or (2) the error was so egregious that it denied the defendant a fair hearing. *Hillier*, 237 Ill. 2d at 545. Garcia argues that plain error can be established under either prong but provides no real analysis of either prong's applicability. Nevertheless, we find that plain error occurred here under the second prong because Garcia was denied a fair sentencing hearing.

¶ 103   We have discussed at length our reasons for finding that the trial court abused its discretion in sentencing defendant to 100 years in prison, based on the unique facts of this case.

In summary, we found that the court abused its discretion in imposing a "trial tax." This finding alone establishes that defendant was denied a fair sentencing hearing. See *Dennis*, 28 Ill. App. 3d at 77-78 (it is unconstitutional for a trial judge to punish a defendant merely for exercising his right to a jury trial). We also found that the court abused its discretion when it failed to adequately consider Garcia's intellectual disability and rehabilitative potential at sentencing. Individually, these actions constitute an abuse of discretion. Cumulatively, they cement our finding that Garcia was denied a fair sentencing hearing. Accordingly, we find that Garcia has established plain error under the second prong that requires reversal, and we therefore remand for a new sentencing hearing.

¶ 104    Finally, we note that because the circuit court judge who presided over this case has retired, a different judge will conduct a new sentencing hearing on remand.

¶ 105                                   III. CONCLUSION

¶ 106    The judgment of the circuit court denying Garcia's motion for a new trial is affirmed. The judgment of conviction is affirmed, but Garcia's 100-year aggregate sentence is vacated, and this case is remanded to the trial court for a new sentencing hearing consistent with our analysis herein.

¶ 107    Affirmed in part and vacated in part; cause remanded.

*People v. Garcia*, **2023 IL App (1st) 172005**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-18394; the Hon. Kevin Sheehan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, Mario Kladis, and Matthew M. Daniels, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Marci Jacobs, and Lisa M. Morrison, Assistant State's Attorneys, of counsel), for the People. |