NOTICE
Decision filed 03/11/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 200285-U

NO. 5-20-0285

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 87-CF-27 |
| | ) | |
| ERNEST PERRY, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's denial of leave to file a successive postconviction petition is affirmed where the defendant failed to show cause for not raising his proportionate penalties claim in an earlier collateral proceeding.

¶ 2    The defendant, Ernest Perry, appeals the trial court's order denying his motion for leave to file a successive petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, the defendant contends that he demonstrated cause and prejudice to file a successive postconviction petition because the case law and community standards surrounding sentencing young adults and intellectually disabled defendants have changed since he was sentenced to life without parole. For the following reasons, we affirm.

1

¶ 3                                    I. Background

¶ 4      We detail only those facts necessary for our disposition. The defendant was arrested on

January 6, 1987, pursuant to an outstanding robbery warrant, and was transported to the police

station in Alton, Illinois. The robbery warrant was unrelated to any of the crimes for which the

defendant was ultimately tried and convicted in this case. Upon arrival at the police station, the

defendant was "booked" and read his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436

(1966)). Subsequently, the defendant was interviewed by Alton police officers regarding the

defendant's possible involvement in the stabbing deaths of Alvin Autery and Mary Irwin. The

defendant gave an oral statement denying any involvement in the murders.

¶ 5      The following day, January 7, 1987, the defendant was arraigned on charges of robbery

and aggravated battery unrelated to the Autery-Irwin murders. At the arraignment, the trial court

granted the defendant's request that an attorney be appointed to represent him, and the trial court

directed that the defendant be transferred to the Madison County jail. The Alton police, however,

obtained a "hold order" so that they could keep defendant in their municipal jail for another day.

¶ 6      On January 8, 1987, the Alton police again interviewed the defendant regarding the Autery-

Irwin murders. Prior to the interview the defendant was advised of his *Miranda* rights. At this time,

the defendant gave a statement confessing that he accompanied his sister's boyfriend, Thermon

Smith, who went to the victims' home to steal their television set. The defendant told the police

that Smith told him to wait outside and act as a lookout while he broke into the house.

¶ 7      On January 9, 1987, the defendant was charged by information with four counts of murder

under section 9-l(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, ¶ 9-l(a)) and two

counts of home invasion under section 12-11(a)(2) of the Criminal Code of 1961 (*id.* ¶ 12-11(a)(2))

2

in connection with the June 29, 1986, stabbing deaths of Alvin Autery and Mary Irwin. The defendant was 20 years old at the time of the murders.

¶ 8    Prior to trial, the defendant filed a motion to suppress his confession on the basis that it had been obtained outside the presence of defense counsel. In his motion, the defendant alleged that "due to his physical, physiological, mental, emotional, educational, and/or psychological state," as well as his "capacity and condition," he was incapable and unable to appreciate and understand the full meaning of his *Miranda* rights, and, therefore, any relinquishment of such rights was not made voluntarily, knowingly, and intelligently. After an evidentiary hearing, the trial court denied the defendant's motion to suppress, and the defendant's confession was admitted at trial.

¶ 9    The case proceeded to a jury trial on June 17, 1988. Autery and Irwin, who were described as mentally retarded, were found dead in their home on July 1, 1986. Detective Richard Wells testified that he was called to assist with the investigation of the crime scene. The detective stated that the victims' front screen door was broken outward. A VCR unit was discovered on the kitchen floor. A deceased male, later identified as Alvin Autery, was discovered face down on a sofa bed, with his arms to his side and his feet somewhat together. A bent knife was found close to the body, as were strips of bed sheet that had been knotted. A deceased female, later identified as Mary Irwin, was found in the hallway, with multiple injuries to her face, head, stomach, and legs.

¶ 10    Officer Anthony Ventimiglia testified that when the defendant initially was taken into custody, he denied participation in the murders. Two videotaped statements by the defendant were played for the jury. The first videotaped statement was made on January 6, 1987, prior to the defendant being charged with murder. The defendant stated that on the night in question he, his family members, and some friends were sitting outside drinking beer. His sister's boyfriend, Thermon Smith, whom the defendant had known for five or six years, was also there. They had

3

been drinking all day and "shooting up" with "some kind of dope." Around midnight, they discussed going to the liquor store before it closed to buy more alcohol. Smith stated that he needed some money and that he was going to go break into a house to get some money or some merchandise. The defendant stated that he "knew this meant that [Smith] was going to go and steal something." His sister tried unsuccessfully to stop Smith from leaving, but he left, walking down the street with an aluminum baseball bat. The defendant stated that at approximately 4 a.m., Smith came back with "a lot of blood" all over his shirt.

¶ 11    On January 8, 1987, Officer Ventimiglia told the defendant that he had spoken with Smith who "told the truth about what had occurred." Although the officer had not, in fact, spoken with Smith, he asked if the defendant wanted to give another statement. The second videotaped statement was given by the defendant. In it, he once again stated that he, his family, and some friends discussed getting more alcohol before the liquor store closed. When Smith asked the defendant if he wanted to make some money, he said yes. Smith told him they were going down the street to break into a house and steal a television set, and the defendant said he would go. When they stopped at a "light colored house," Smith told him to wait outside and watch out for neighbors. After a few minutes, he heard a man and a woman "yelling and screaming." He stated that he became frightened and fled the scene, returning to his home. The defendant stated that he did not go inside the house, even though he had heard that Smith had been telling other people that he and Smith had killed the victims. He also stated that he did not know that Smith was going to hurt anyone, but he admitted he knew Smith carried a knife.

¶ 12    Michael Terrell, who was in jail at the same time as the defendant, testified that the defendant told him that he had killed a woman named Mary after she recognized him and that he had taken a VCR and tapes. Terrell also testified that the defendant had mentioned tying her with

4

a sheet. In exchange for his testimony, Terrell did not have to complete a long term of drug treatment associated with the charges against him, had his probation transferred to a different state, and was released from jail. Though Terrell testified that the defendant told him about the murder in March 1988, Terrell did not come forward until he learned he could receive a benefit in his own case.

¶ 13 The State had submitted to the jury the defendant's eligibility for the death penalty, arguing that he was eligible for the death penalty under either of two aggravating factors: first, that the defendant was over the age of 18 and guilty of murdering more than one person as long as he had an intent to kill more than one person; and second, that the defendant was over the age of 18 and one of two other circumstances applied: (1) either, if murdered by the defendant, the murdered person was killed in the course of another felony, or (2) that the murdered person received injuries from the defendant at the same time as injuries from a person whose conduct the defendant was legally responsible for, that either of those injuries caused the death, and he had the intent to kill or knowledge that his acts created a strong probability of death, and the other felony was home invasion. Although the jury received both instructions, they found the defendant ineligible for the death penalty. The jury found the defendant guilty on all six counts.

¶ 14 A sentencing hearing was held on August 30, 1988. The trial court denied the defendant's posttrial motions. Neither the State nor the defendant presented witnesses. The presentence investigation (PSI) revealed that the defendant had been in special education classes, although the defendant reported that he did not know why and denied being a slow learner. The PSI also revealed that the defendant had three juvenile adjudications and one adult conviction for burglary. The State argued for a life sentence for the double murder. Defense counsel argued that the requirement of a mandatory life sentence removed the trial court's discretion. He further argued,

in mitigation, that the defendant had a short criminal record, was young, and was acting as a lookout. Defense counsel argued that due to the defendant's age and his level of participation in the crime, it was unfair that the defendant be sentenced to life imprisonment.

¶ 15 In pronouncing sentence, the trial court reasoned it was bound by the sentencing statute in effect at the time to impose a life sentence. The defendant was sentenced to two terms of natural life imprisonment pursuant to section 5-8-1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, ¶ 1005-8-1(a)(1)(c)), which mandated an automatic natural life sentence for first degree murder where, as here, the defendant was found guilty of murdering more than one victim, as well as 30 years' imprisonment on each of the home invasion convictions.[1]

¶ 16 The defendant appealed his convictions, arguing that the trial court erred in denying his motion to suppress. This court reversed the defendant's convictions. See *People v. Perry*, 205 Ill. App. 3d 655 (1990). However, that decision was later reversed by our state supreme court in *People v. Perry*, 147 Ill. 2d 430 (1992) (citing *McNeil v. Wisconsin*, 501 U.S. 171 (1991), which was decided after this court's decision in *Perry*). In reversing this court's decision, the supreme court remanded the cause for consideration of the remaining arguments which the defendant had raised on appeal that had not been addressed. On remand, this court rejected the defendant's additional claims of error related to (1) the propriety of imposing natural-life sentences on a defendant charged on a theory of accountability and (2) the court's handling of a *pro se* posttrial motion alleging ineffective assistance of counsel. See *People v. Perry*, 230 Ill. App. 3d 720 (1992).

¶ 17 The defendant subsequently filed several collateral challenges to his convictions and sentences. In July 1992, while his direct appeal was pending, the defendant filed a petition seeking relief under the Post-Conviction Hearing Act. The defendant alleged that his constitutional rights

---

[1]The trial court did not impose sentence on two of the murder convictions.

were violated because (1) he was not proven guilty beyond a reasonable doubt and (2) the State used its peremptory challenges to excuse the only two black venire members in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The defendant also alleged that he received ineffective assistance of counsel because trial counsel (1) failed to discover and call potential defense witnesses, (2) did not object to the lack of potential black jurors in the venire or file a proper motion pursuant to *Batson*, (3) did not object to improper closing arguments, (4) failed to preserve issues for appeal, and (5) "did not allow" defendant to testify in his own defense. The defendant further alleged that he received ineffective assistance of appellate counsel because appellate counsel did not raise any of these issues in his direct appeal. The trial court summarily dismissed the defendant's petition for postconviction relief, finding it to be frivolous and patently without merit. Four months later, the defendant filed a petition for leave to file a late notice of appeal from the trial court's ruling, which was denied in February 1993.

¶ 18      In December 2000, the defendant filed a petition for relief from judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2000)). The defendant challenged his sentence, relying on *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The State filed a motion to dismiss, which the trial court granted. The defendant appealed, and this court affirmed the trial court's ruling in October 2002. See *People v. Perry*, No. 5-01-0404 (Oct. 11, 2002) (unpublished order under Illinois Supreme Court Rule 23).

¶ 19      On June 5, 2019, the defendant obtained new counsel. The defendant, by counsel, filed a motion for leave to file a successive postconviction petition predicated upon "newly-expanded constitutional law" as set forth in *People v. Coty*, 2018 IL App (1st) 162383. He asserted that *Coty* was "an expansion of the prohibition against execution of the mentally disabled as found in *Atkins v. Virginia* 2002, and clarified in *Hall v. Florida*, 2014," and that it paralleled the principles found

7

in *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny. The defendant specifically argued that his "severe intellectual disability and the unconstitutionality of a life sentence as applied to him as a person who is severely mentally disabled" was a "clear-cut case of 'cause and prejudice.' " Along with the motion was the defendant's petition for postconviction relief with attached documents described by the defendant as "significant documentation of his intellectual disability." These documents included a disability determination by the Social Security Administration, dated March 22, 1985, which provided a diagnosis of "moderate mental retardation"; a psychological evaluation, completed April 9, 1985, suggesting that a previous determination that the defendant had an I.Q. of 45 might have been an overestimate and further suggesting that his I.Q. might be even lower; and a disability determination, dated June 19, 1986, which stated a primary diagnosis for the defendant was "mental retardation." There was no mention of the defendant's age at the time of the murders nor at the time of sentencing.

¶ 20    On August 27, 2020, the trial court issued its order denying the defendant's motion for leave to file a successive postconviction petition, noting that since the date of the filing of his petition, the case relied upon by defendant, *People v. Coty*, 2018 IL App (1st) 162383, had been reversed by our supreme court. See *People v. Coty*, 2020 IL 123972. Further, the trial court found that the defendant's petition relied on documents created in 1985 and 1986 which would have been readily obtainable prior to the defendant's trial as well as any time during the past 32 years. The defendant filed a timely notice of appeal.

¶ 21                                    II. Analysis

¶ 22    On appeal, the defendant contends that his mandatory life sentences violate the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) as applied to him because

8

he was 20 years old when the murders occurred, and the trial court was not allowed to consider his youth or his intellectual disability in sentencing. The defendant submits that he demonstrated both cause and prejudice to file a successive postconviction petition where he showed that the law on sentencing intellectually disabled and young offenders has substantively changed since his sentencing in 1988 and since the filing of his initial postconviction petition in 1992. The State counters that the trial court properly denied the defendant's motion for leave to file a successive postconviction petition where the defendant failed to establish either cause or prejudice.

¶ 23    The Post-Conviction Hearing Act (Act) provides a procedural mechanism for defendants to raise claims of violations of their constitutional rights. *People v. Robinson*, 2020 IL 123849, ¶ 42. The Act is a collateral attack on a final judgment and not a substitute for a direct appeal. *Id.* Although only one postconviction proceeding is contemplated under the Act (*People v. Edwards*, 2012 IL 111711, ¶ 22), a defendant seeking to file a successive postconviction petition may obtain leave of court (*People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)). However, the bar against successive postconviction proceedings should not be relaxed unless (1) a defendant can establish "cause and prejudice" for the failure to raise the claim earlier or (2) he can show actual innocence under the "fundamental miscarriage of justice" exception. *Edwards*, 2012 IL 111711, ¶¶ 22-23.

¶ 24    The filing of a successive postconviction petition is "highly disfavored" (*People v. Simms*, 2018 IL 122378, ¶ 38) and allowed only in "very limited circumstances" (*People v. Davis*, 2014 IL 115595, ¶ 14). *People v. Montanez*, 2023 IL 128740, ¶ 73. The Act provides that a defendant's claim of substantial denial of constitutional rights not raised in his original or amended postconviction petition is waived. *Id.* ¶ 74; 725 ILCS 5/122-3 (West 2020). Thus, the procedural bar of waiver, in the context of a successive postconviction petition, is not merely a principle of

judicial administration but an express requirement of the Act. *Montanez*, 2023 IL 128740, ¶ 74 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002)).

¶ 25 Here, the defendant contends that he demonstrated both cause and prejudice. The cause-and-prejudice test is set out in section 122-1(f) of the Act as follows:

"Leave of court [for filing a successive postconviction petition] may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure. For purposes of this subsection (f): (1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2020).

¶ 26 A motion for leave to file a successive petition seeking postconviction relief should be denied where "it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." (Internal quotation marks omitted.) *People v. Bailey*, 2017 IL 121450, ¶ 21. It is the defendant's burden to establish a *prima facie* showing of cause and prejudice in order to be granted leave before further proceedings on his claims can follow (*id.* ¶ 24), and both elements must be satisfied for defendant to prevail. *People v. Guerrero*, 2012 IL 112020, ¶ 15. A reviewing court applies a *de novo* standard to a trial court's denial of a motion for leave to file a successive postconviction petition. *People v. Lusby*, 2020 IL 124046, ¶ 27.

¶ 27 As previously noted, the defendant predicated his motion for leave to file a successive postconviction petition upon "newly-expanded constitutional law" as set forth in *People v. Coty*, 2018 IL App (1st) 162383. In *Coty*, 2018 IL App (1st) 162383, ¶ 77, the appellate court held that a 50-year sentence imposed on a 52-year-old intellectually disabled adult constituted a *de facto* life sentence and that imposing such a sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). However, in *People v. Coty*, 2020 IL 123972 (*Coty II*), our supreme court reversed the appellate court, holding that a natural life sentence, actual or *de facto*, does not violate the proportionate penalties clause as applied to an intellectually disabled adult.

¶ 28 In *People v. Hampton*, 2021 IL App (5th) 170341, ¶ 119, we had occasion to consider the precedents and rationale underlying our supreme court's decision in *Coty II*. We noted that the issues involved in both *Coty* and *Hampton* arose "from a series of United States Supreme Court cases addressing what limits the eighth amendment places on sentences that may be imposed on two classes of defendants with characteristics that make them less culpable than other defendants—juveniles and individuals with intellectual disabilities." *Id.* ¶ 120. We began with *Atkins v. Virginia*, 536 U.S. 304, 318 (2002), wherein the United States Supreme Court held that the eighth amendment categorically precludes imposition of the death penalty on adult defendants with intellectual disabilities. *Id.* ¶ 121. We then noted that the Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551, 578-79 (2005) (eighth amendment categorically prohibits death sentences for juveniles), and *Graham v. Florida*, 560 U.S. 48, 82 (2010) (eighth amendment categorically precludes natural life sentences for juveniles who commit crimes other than homicide), were premised on the characteristics of youth that make juvenile defendants both less morally culpable and more likely to be rehabilitated than adult defendants. *Id.* ¶ 122.

11

¶ 29    Next, we detailed how the Supreme Court considered the characteristics described in *Roper* and *Graham* in deciding *Miller v. Alabama*, 567 U.S. 460, 471-73 (2012). In *Miller*, 567 U.S. at 479, the Court held that a mandatory sentence of life without the possibility of parole violates the eighth amendment when imposed on a murder defendant for a murder committed by a juvenile defendant. *Id.* at 470. Although the Supreme Court recognized that youthful characteristics do not disappear when an individual turns 18 (*Roper*, 543 U.S. at 574), the Court limited its holdings to defendants who were under the age of 18 when they committed their offenses, reasoning that the line must be drawn somewhere. *Miller*, 567 U.S. at 465; *Graham*, 560 U.S. at 74-75; *Roper*, 543 U.S. at 574; see also *People v. Harris*, 2018 IL 121932, ¶ 56 (noting the Supreme Court has never extended its reasoning to young adults over the age of 18). In *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), the Court held that *Miller* was to be construed retroactively. See also *People v. Davis*, 2014 IL 115595, ¶ 42 (*Miller v. Alabama* made retroactive to Illinois cases on collateral review). In reversing *Coty I*, the supreme court found that the appellate court had extended the requirements of *Miller* and its progeny, via *Atkins*, to adult offenders with intellectual disabilities. *Coty*, 2020 IL 123972, ¶¶ 17-18.

¶ 30    After the defendant filed his reply brief, but prior to oral argument on July 10, 2023, we granted him leave to cite as additional authority, *People v. Moore*, 2023 IL 126461, issued by the Illinois Supreme Court on May 18, 2023. In *Moore*, the supreme court considered two consolidated appeals involving defendants who were 19 years old at the time of their respective offenses, and both were sentenced to life in prison without parole. *Id.* ¶ 1. Each defendant claimed that *Miller* provided cause for raising new constitutional challenges to their sentences in a successive postconviction petition. *Id.* ¶ 36. The *Moore* court explained that because *Miller* did not directly apply to young adults, it did not provide cause for a young adult to raise a claim under either the

12

proportionate penalties clause of the Illinois Constitution or the eighth amendment to the United States Constitution. *Id.* ¶¶ 38, 40. Thus, the *Moore* court held that *Miller* did not provide cause for the defendants to file their proposed successive postconviction petitions. *Id.* ¶ 44.

¶ 31   In his motion, the defendant acknowledged that he was making a similar claim. However, he argues his case differed in important ways from the defendants in *Moore*, and, thus, his case requires a different result. The defendant asserts that although both defendants in *Moore* received life sentences, our supreme court noted that "[t]he evidence and arguments raised at the sentencing hearings for both Moore and Williams show the parties knew Illinois law recognized the special status of young adults, especially those subject to adverse influences, for purposes of applying the principles of the proportionate penalties clause." *Id.* ¶ 42. The defendant contends that at his sentencing hearing, the trial court was prevented from considering in any meaningful way the mitigating effect of his youth when it reasoned that life in prison without parole was the only available sentence.

¶ 32   Here, the defendant made no mention of his youth in his motion for leave to file a successive postconviction petition; rather, the defendant raises this argument for the first time on appeal. As our supreme court recently noted in *Montanez*, 2023 IL 128740, ¶ 88, "it is a well-settled proposition that postconviction petitioners may not raise claims on appeal that were not included in their motions for leave to file or in their proposed successive petitions." In *Montanez*, the supreme court affirmed the denial of the defendant's motion for leave to file a successive postconviction petition where the defendant did not raise the issue in his motion, finding that the motion fell short of demonstrating that the procedural hurdles for filing a successive petition should be lowered. *Id.* ¶ 123. Accordingly, we reach the same conclusion regarding the defendant's claim here.

13

¶ 33　In his motion to cite additional authority, the defendant notes that in *Moore*, 2023 IL 126461, ¶ 41, the Illinois Supreme Court cited *People v. Clark*, 2023 IL 127273, for the proposition that Illinois law has long recognized intellectual disability as a factor in mitigation. The defendant correctly points out that, unlike the defendants in *Moore*, he was unable to present evidence of his intellectual disability, and its potential mitigation, at sentencing because it was not yet recognized as a factor that could be considered in mitigation in 1988. However, the defendant has not shown "cause" where he fails to identify an objective factor that impeded his ability to raise this claim in his initial postconviction petition which he filed in July 1992. In 1990, our legislature added "intellectually disabled" to the list of mitigating factors to be considered in sentencing. *Coty*, 2020 IL 123972, ¶ 33; see Pub. Act 86-903 (eff. Jan. 1, 1990) (adding 730 ILCS 5/5-5-3.1(a)(13)); see also Pub. Act 97-227, § 145 (eff. Jan. 1, 2012) (changing "mentally retarded" to "intellectually disabled"). Because the documents relied upon by the defendant in his motion for leave to file a successive postconviction petition were dated 1985 and 1986, they would have been available to, or at the very least obtainable by, the defendant to support his initial postconviction petition. Where a defendant fails to demonstrate a *prima facie* showing of both prongs of the test, the trial court must deny the defendant's motion for leave to file a successive postconviction petition. *Montanez*, 2023 IL 128740, ¶ 79 (citing *People v. Smith*, 2014 IL 115946, ¶ 35).

¶ 34　　　　　　　　　　　　　　　III. Conclusion

¶ 35　For the foregoing reasons, we affirm the trial court's judgment.


¶ 36　Affirmed.

14